**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Aaron Thomas LUSTER, Appellant.**

Superior Court of Pennsylvania.

Argued April 30, 2013.
Filed July 23, 2013.

Scott Coffey, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney, Sandra Preuhs, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, BOWES, GANTMAN, DONOHUE, ALLEN, OLSON, OTT, and WECHT, JJ.

OPINION BY ALLEN, J.:

Aaron Thomas Luster ("Appellant") appeals from the trial court's order denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* Claiming ineffective assistance of counsel, Appellant seeks relief from an aggregate sentence of 14 to 28 years' imprisonment, which was imposed following his conviction by a jury of third degree murder and murder of an unborn child.[1] We affirm.

We glean the following facts and procedural history from the record. On January 28, 2003, at approximately 2:30 a.m., the corpse of Christine Karcher, ("victim"), was discovered by police on Route 60 in the Moon Township/Coraopolis area of Allegheny County. At that time, the victim was approximately seven months pregnant. She was romantically involved with Appellant, but lived with Chester Bell. Bell had been the victim's boyfriend for ten years. She had informed Bell that Appellant was the father of her unborn child.

On January 27, 2003, at approximately 9:00 p.m., Bell had a drink with the victim at a Coraopolis bar known as the Black Stones. The victim was a drug user and a heavy drinker. The victim left the bar stating that she was going to play cards with some friends. About one hour later, Bell went home and fell asleep. At approximately 3:30 a.m. on January 28, 2003, Bell awoke and discovered that the door to his residence was open, and that his Dodge Dynasty, cell phone, and a red Toyota Camry belonging to his employer were missing. Bell assumed that the victim had borrowed the missing items and went back to sleep. When he awoke the following morning, the items were still missing. Bell was unable to reach the victim on the cell phone. Bell contacted his employer, and the red Toyota Camry was reported as stolen. Later that day, Bell learned that the police wanted to speak with him in connection with the victim's death.

At approximately 10:30 p.m., on January 27, 2003, Eric Branaugh, the victim's friend, was walking home after work when he encountered the victim driving the Dodge Dynasty. The victim appeared drunk, nervous, and afraid. The victim explained to Branaugh that she and Appellant had argued, and that she feared Appellant was planning to harm her. Although Branaugh refused the victim's request to accompany her to a bar, he gave her his telephone number and told her that she could call him.

Between 10:00 p.m. and 11:00 p.m. on January 27, 2003, Michael Smith arrived at Chez Lounge, a bar near the Black Stones. Smith knew the victim and Appellant. Smith saw the victim drinking at Chez Lounge. Sometime before 1:00 a.m. on

---

1. 18 Pa.C.S. §§ 2502(c) and 2604, respectively.

January 28, 2003, Smith accompanied the victim to a nearby bar named Wayne's Lounge, and then back to Chez Lounge. During their return drive to Chez Lounge, the victim's cell phone "kept ringing," but she "kept ... turning it off." N.T., 3/15–19/04, at 109. Smith and the victim encountered Appellant when they arrived at the parking lot of Chez Lounge between 1:00 a.m. and 2:00 a.m. on January 28, 2003. Appellant appeared to be angry with Smith and the victim. Appellant approached Smith with clenched fists and accused Smith of having sex with the victim. Smith explained to Appellant that they were merely friends. Appellant then said to the victim, "[G]et the f— out of the car, now, you bitch." *Id.* at 111. Smith described Appellant as "real angry" and reported that Appellant also said "get the F out of the car, are you F"ing my girlfriend, what the hell, I've been calling you, what the F." *Id.* at 112. Smith entered the bar after being assured by the victim that she was "okay." *Id.* at 111. Smith exited the bar approximately five minutes later and noted that Appellant and the victim had left. Smith observed that the Dodge Dynasty that the victim had been driving was in the parking lot, while the red Toyota Camry that Appellant had been driving was gone.

Following her departure with Appellant, the victim made several calls to 911 with Bell's cell phone. The conversations with the 911 operator began at 1:52 a.m. on January 28, 2003. During the 911 calls, the victim was either moaning and crying, or desperately pleading for help while a male voice was heard in the background. The recordings of those 911 calls were played for the jury and they lasted twelve to fifteen minutes. Bell listened to the 911 calls and identified the male voice as belonging to Appellant. *Id.* at 377. On January 28, 2003 at 2:09 a.m., state police in the area of Route 60 were advised "to be on the lookout for a red Toyota Camry with a female possibly being assaulted on the interstate." *Id.* at 190.

The victim also telephoned Branaugh. In that telephone conversation, the victim told Branaugh that Appellant was trying to kill her. Branaugh overheard Appellant in the background threatening to kill the victim. Branaugh was unable to ascertain where the victim was calling from and he did not obtain help for her.

At approximately 2:15 a.m. on January 28, 2003, the victim was lying prone on Route 60 when she was struck by a vehicle driven by James Caleffi. Caleffi had a few beers prior to the incident and thought that he had hit a deer or other object. He stopped his vehicle in a hotel parking lot nearby. Caleffi phoned 911 to report that there was an obstruction on the road. Police discovered the victim's corpse on Route 60 at approximately 2:30 a.m. Most of the victim's brain was on the road next to her body. Her unborn child had died as well. A police accident reconstructionist was immediately dispatched to the scene, and his subsequent investigation included a review of the accident scene, Caleffi's car, and the red Toyota Camry. He concluded that Caleffi ran over the victim's head while she was lying on the road.

Sometime in the early morning hours of January 28, 2003, Appellant gave the red Toyota Camry to James Dixon in exchange for crack cocaine. During the same time frame, Appellant used Bell's cell phone to call his wife, Cherryl Ann Luster ("Wife"). Appellant asked his wife, "will you love me no matter what I did[?]" *Id.* at 132. Wife answered affirmatively, but Appellant refused to tell her what he had done. Later in the day on January 28, 2003, Wife saw Appellant at his mother's home. Wife testified that she observed Appellant kneeling over a bed with his hands on his face.

Appellant would not respond to Wife's inquiries about why he appeared upset. Police then arrived at the residence.

Appellant gave two statements to police. On January 28, 2003, at approximately 5:00 p.m., State Trooper Kevin S. Scott went to Appellant's home. Appellant agreed to accompany Trooper Scott to the police station. Trooper Scott testified that during the trip, Appellant asked Trooper Scott whether the investigation was "about the girl that got hit on 60 last night." *Id.* at 399. Trooper Scott responded affirmatively and said that police were attempting to ascertain a timeline of the victim's whereabouts the previous night.

Trooper Scott further testified that Appellant stated he had been "partying in Coraopolis" with the victim, that they had gone to Bell's home "to get some money for crack," and that the victim had left Appellant at Bell's home. *Id.* Appellant reported to Trooper Scott that following the victim's departure, Appellant took the keys to the red Toyota Camry and Bell's cell phone and began looking for her. *Id.* at 399–400. Appellant told Trooper Scott that Appellant found the victim with another man. *Id.* at 400. Trooper Scott testified that Appellant explained that "there was an argument" and Appellant "put [the victim] into the Camry and said we're going to go to Carnegie [where Appellant and the victim had an apartment together] to try to work things out." *Id.* Appellant explained to Trooper Scott that the "fighting intensified" while they were on the way to Carnegie. *Id.* According to Trooper Scott, Appellant "said that [the victim] didn't want to go to Carnegie so he was going to put her out of the car." *Id.* Trooper Scott stated that Appellant's exact words were that he planned to "put her out of the car." *Id.* Appellant relayed that at that point, Appellant and the victim observed a police car and "the fighting relaxed," but as soon as they "passed the police car, the fighting got more intense." *Id.* at 400–401. Appellant "said that is when he put her out of the car. Slammed the gear shift into park and put her out of the car." *Id.* Appellant offered to show Trooper Scott "where he put her out of the car." *Id.* at 401. "After [Appellant] told [Trooper Scott] that he put her out of the car four times, then he showed [Trooper Scott] where it occurred." *Id.* at 401. Appellant showed Trooper Scott that Appellant removed the victim from the Camry at the point where the victim's body was found. *Id.* Appellant concluded his conversation with Trooper Scott by relating that after he removed the victim from the car, he went to another section of Pittsburgh to purchase crack cocaine. *Id.* at 401–402.

State Trooper Pierre Wilson testified that Appellant agreed to speak with police once Appellant arrived at the police station. A tape recording of this interview was played for the jury at trial. *Id.* at 379. That interview was not placed in the trial transcript, but trial counsel's closing arguments indicate that Appellant told police that Appellant and the victim were arguing while they were traveling along Route 60 in the red Toyota Camry. *Id.* at 455. According to Appellant, the victim "threw the car into park," propelling Appellant and the victim "forward." *Id.* at 455. The victim "banged her face into [the] dashboard." *Id.* Appellant reported that the victim then left the car of her own accord and ran away. *Id.* at 453.

In the course of their investigation, police found the victim's blood on Appellant's clothing and on three different locations inside the red Toyota Camry. A hair matching the victim's DNA was discovered wrapped around a bar located on the rear passenger side of the undercarriage of the Toyota.

Dr. Leon Rozin, chief forensic pathologist with the Allegheny County Coroner's Office, autopsied the victim's body. Dr. Rozin testified that the victim was severely intoxicated and had a blood alcohol content of .35%. *Id.* at 329. According to Dr. Rozin, the victim had cocaine metabolites in her urine. *Id.* The unborn child was normally developed and died from cessation of blood flow due to the victim's death. *Id.* at 331. The majority of the trauma was located on the victim's head and the upper portion of her chest, while the abdomen and baby were intact. The victim's head had been squeezed between a tire and the surface of the road such that her skull was totally disfigured and the brain was located on the road. Dr. Rozin concluded that the skull disfigurement was consistent with the victim lying on the ground and having been run over by "at least one tire of a motor vehicle." *Id.* at 333. Her right shoulder also sustained a "huge laceration." *Id.* at 334. As to her upper torso, her ribs were fractured and her heart had been crushed. Both of the victim's bones in her right forearm were fractured. *Id.* at 340. Several bruises and abrasions were found on the victim's chest and abdominal areas, and two bruises were located on the inner surface of her right arm. The victim's hands and left arm were bruised and she had a strangulation injury around her neck. None of these injuries were inflicted by a car, but rather, were the result of a manual assault. *Id.* at 337–39, 343. Dr. Rozin concluded that the victim died from being run over by a car while lying on the highway, and that the manually-inflicted injuries, coupled with the level of intoxication, would have "compromised" the victim. *Id.* at 353. Dr. Rozin stated that the victim would not have been "incapacitated" by the manual trauma. *Id.*

Appellant was charged with the aforementioned murder crimes. On March 19, 2004, following a weeklong trial, a jury found Appellant guilty of third degree murder in both the death of the victim and her unborn child. Two months later, Appellant was sentenced to two consecutive terms of imprisonment of seven to 14 years, for an aggregate term of imprisonment of 14 to 28 years. Appellant filed a timely direct appeal challenging the sufficiency of the evidence, the trial court's jury instructions on causation and the trial court's ruling which permitted the Commonwealth to play the 911 tape recording to the jury. On April 17, 2006, this Court affirmed the judgment of sentence. *Commonwealth v. Luster*, 902 A.2d 979 (Pa.Super.2006) (unpublished memorandum). On February 27, 2007, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Luster*, 591 Pa. 681, 917 A.2d 313 (2007). Appellant filed a timely *pro se* PCRA petition on July 5, 2007. Counsel was appointed, but on February 11, 2008, counsel filed a petition to withdraw his appearance, and a no-merit letter pursuant to *Commonwealth v. Finley*, 379 Pa.Super. 390, 550 A.2d 213 (1988). Two days later, the PCRA court granted counsel's petition to withdraw. On April 4, 2008, the trial court denied Appellant's PCRA petition without holding an evidentiary hearing. Appellant filed a *pro se* appeal to this Court. On September 21, 2009, a panel of this Court concluded that at least seven of the issues raised by Appellant in his PCRA petition were, potentially, of arguable merit. Thus, we reversed the order of the PCRA court and remanded the case "with directions for the trial court to reinstate [Appellant's] PCRA petition, and appoint new counsel to assist him in his pursuit of PCRA relief." *Commonwealth v. Luster*, 986 A.2d 1259 (Pa.Super.2009) (unpublished memorandum at 31).

Upon remand, the PCRA court appointed Scott Coffey, Esquire, to represent Appellant. Mr. Coffey filed an amended PCRA petition on March 2, 2010. However, Appellant refused to sign a verification for the petition since he asserted that he wished to raise several more issues in his PCRA petition. Following a brief hearing on October 27, 2010, Mr. Coffey filed a second amended PCRA petition in which he included the additional issues Appellant wished to raise. The PCRA court conducted a hearing on January 11, 2011, at which both trial and direct appeal counsel testified. On February 28, 2011, the PCRA court entered an order, with an accompanying opinion, again dismissing Appellant's petition for PCRA relief. This timely appeal followed.

Appellant presents the following issues for our review:

1. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL FOREMAN WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE HEARSAY TESTIMONY OF COMMONWEALTH WITNESS ERIC BRANAUGH?

2. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CROSS–EXAMINE BRANAUGH REGARDING TRIAL TESTIMONY THAT WAS INCONSISTENT WITH A STATEMENT THAT HE HAD GIVEN TO POLICE?

3. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE TESTIMONY OF APPELLANT'S WIFE REGARDING COMMENTS THAT HE ALLEGEDLY MADE TO HER FOLLOWING THE INDECENT [sic] WITH [THE VICTIM]?

4. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN A FORENSICS EXPERT TO COUNTER THE COMMONWEALTH'S ADVANCED THEORY THAT APPELLANT HAD STRUCK [THE VICTIM] WITH HIS CAR AFTER FORCING HER OUT OF THE CAR, OR TO COUNTER THE COMMONWEALTH'S THEORY THAT THE VICTIM WAS LYING ON THE ROADWAY WHEN HIT BY CALEFFI [SHE MAY HAVE BEEN ALERT AND WALKING, OR NOT EVEN ON THE ROADWAY (ON THE BERM), WHEN STRUCK AND KILLED BY CALEFFI]?

5. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S MISCONDUCT IN ALLEGING IN CLOSING ARGUMENT THAT APPELLANT RAN OVER AND [sic] INCAPACITATED [VICTIM]; THERE WAS NO EVIDENCE OF RECORD TO SUPPORT SUCH AN ASSERTION?

6. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL AND/OR APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE A WEIGHT OF THE EVIDENCE CLAIM, REGARDING THE THIRD–DEGREE MURDER CONVICTIONS, IN POST SENTENCING MOTIONS/DIRECT APPEAL?

7. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE APPELLATE

COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE A CLAIM REGARDING THE TRIAL COURT ERROR IN ADMITTING THE IRRELEVANT AND PREJUDICIAL TESTIMONY OF ROBERT PENNYBAKER, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INCLUDE AS PART OF HIS OBJECTION A CLAIM THAT THE TESTIMONY CONSTITUTED PREJUDICIAL PRIOR BAD ACTS OF APPELLANT?

8. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A SUPPRESSION MOTION REGARDING APPELLANT'S STATEMENT TO TROOPER SCOTT WHILE BEING TRANSPORTED SINCE APPELLANT WAS NEVER GIVEN MIRANDA WARNINGS?

9. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR PRESENTING A "FRIVOLOUS AND MEANINGLESS DEFENSE" TO THE HOMICIDE CHARGES?

10. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE TESTIMONY OF ERIC BRANAUGH INDICATING THAT HE HEARD APPELLANT'S VOICE IN THE BACKGROUND DURING A TELEPHONE CALL BETWEEN BRANAUGH AND [THE VICTIM]?

11. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO IMPEACH CORONER DR. LEON ROZIN REGARDING HIS "CONTRADICTORY TESTIMONY"?

12. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING [TO] OBJECT TO TELEPHONE RECORDS INTRODUCED INTO EVIDENCE SINCE THEY WERE NOT ACCOMPANIED BY TESTIMONY FROM THE CUSTODIAN OF THOSE TELEPHONE RECORDS?

13. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PCRA PETITION SINCE TRIAL COUNSEL WAS INEFFECTIVE FOR "FAILING TO CHALLENGE THE CAUSATION RULE AT EVERY LEVEL OF TRIAL"?

Appellant's Brief at 3–4.

When reviewing the denial of PCRA relief, "we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error." *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111, 1127 (2011) (internal citation omitted). Here, all of Appellant's claims allege the ineffectiveness of prior counsel.

To prevail on an ineffective assistance claim, a defendant must establish "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim.

*Commonwealth v. Johnson*, 27 A.3d 244, 247 (Pa.Super.2011) (internal citations omitted). The Pennsylvania Supreme Court has emphasized, " '[i]f it is clear that [the petitioner] has not demonstrated that

counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.'" *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 799 (2007), *quoting Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998).

Appellant's first, second, and tenth issues involve Branaugh's testimony. Because these issues are interrelated, we will address them together. Branaugh testified that he was walking home from work at approximately 10:30 p.m., on the evening of January 27, 2003, when the victim pulled up in the Dodge Dynasty. Branaugh described the victim as "nervous and scared," and noted that "[s]he sounded like she had been drinking." N.T., 3/15–19/04, at 100. Branaugh testified that the victim told him that she and Appellant "had an argument that night and [Appellant] was going to do something real bad to her and she was ... really scared." *Id.* at 100–101. The victim then asked Branaugh to have a drink and "hang out with her to make sure that nothing happen[ed] to her." *Id.* at 101. Branaugh declined but gave her his cell phone number, and told her to call him "a little later." *Id.* Branaugh testified that approximately an hour later he received a call from the victim, which he described as follows:

> At that time when she called me ... she was in a car. She says she was with [Appellant], she was scared. She was crying. I heard [Appellant] in the background screaming and cussing at her. She was telling me that he's trying to kill me. He's trying to kill me.

*Id.* at 102. Branaugh testified specifically that during the phone call, he heard Appellant "cussing and screaming" at the victim, saying things such as "[y]ou bitch, mother f[ ]er and I'm going to kill you, bitch, and a

couple just obscenities." N.T., 3/15–19/04, at 102. Branaugh estimated that the call lasted approximately three to four minutes before "the phone went dead". *Id.* at 102–103.

Appellant challenges trial counsel's effectiveness for (1) failing to object to Branaugh's identification of Appellant's voice, (2) failing to object to the testimony as inadmissible hearsay, and (3) failing to cross-examine Branaugh with a prior inconsistent statement.

 Appellant contends that Branaugh acknowledged that he did not know Appellant well and that he had not talked with him much, rather only to "say hi." N.T., 3/15–19/04, at 103. However, Branaugh's identification of Appellant was not based upon his recognition of Appellant's voice, but rather upon the fact that the victim told him that she was in a car with Appellant. Branaugh testified that the victim told him that "she was in a car ... with [Appellant] ..." *Id.* at 102. Significantly, trial counsel testified at the PCRA hearing as follows:

> [Branaugh's] testimony was based on possible assertions by [the victim] that she was with [Appellant], and that he was doing these terrible things to her, and then [Branaugh] said he overheard in the background certain things threats or expletives being used. It was fairly clear I believe that [Branaugh] believed based on his conversation that it was [Appellant]. **[Branaugh] didn't say it was based on voice identification. [Branaugh] said it was based upon what [the victim] had told him and what he heard on the phone call.**

N.T., 1/11/11, at 29 (emphasis supplied). We agree, and do not find that Branaugh's identification of Appellant was based on Appellant's voice. Further, considering that Appellant admitted he was in a car with the victim that evening, and that the

911 recording which was played for the jury provided evidence of an ongoing assault in that vehicle, we determine that any error that could be derived from Branaugh's identification by voice, rather than by the victim's statement, of Appellant as the man "cussing and screaming" at the victim was harmless. *Id.* at 102.

■ Appellant also argues that trial counsel was ineffective for failing to object to Branaugh's testimony as hearsay. Hearsay testimony is "a statement, other than one made by the declarant ... offered in evidence to prove the truth of the matter asserted," and is generally, inadmissible at trial. Pa.R.E. 801(c), 802. However, excited utterances and statements relating to the declarant's existing state of mind are admissible exceptions to the hearsay rule. *See* Pa.R.E. 803(2), (3). Branaugh's testimony concerning the victim's statements to him (1) on the street when she stated that she was fearful that Appellant "was going to do something real bad to her," and (2) in Appellant's car when she stated that she was "scared" and that Appellant was "trying to kill" her, both constitute hearsay. N.T., 3/15–19/04, at 100–101. Therefore, we must determine whether they qualify as exceptions to the hearsay rule.

In its opinion, the PCRA court found that the victim's statements "fit squarely" into the "state of mind" and "excited utterance" exceptions to the hearsay rule. PCRA Court Opinion, 2/28/11, at 3. We disagree with the trial court's determination that the victim's statement to Branaugh on the street that she was scared that Appellant "was going to do something real bad to her" was an excited utterance. The victim was not under the stress of a startling event at the time that she made that statement. *See* Pa.R.E. 803(2). However, we find that this statement fell

under the "state of mind" exception to the hearsay rule.

Rule 803(3) provides an exception to the preclusion of evidence under the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health." Pa.R.E. 803(3). As a panel of this Court noted in the prior PCRA appeal, "[t]he admissibility of statements such as those by Branaugh ... have been subject of considerable discussion in Pennsylvania jurisprudence." *Commonwealth v. Luster*, 986 A.2d 1259 (Pa.Super.2009) (unpublished memorandum at 13). Generally, our appellate courts have held that out-of-court statements by homicide victims are admissible when the statements are relevant for some other purpose, such as proof of motive or malice. *See Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000) (victim's statements that he did not trust defendant/brother and that he believed that defendant was trying to pass off replica model trains as originals were admissible to prove motive and ill will between brothers). Here, the victim's statement that she feared Appellant and he was going to harm her is admissible because it shows Appellant's ill will and malice toward the victim. *Id.* at 225. Further, the statement explains why the victim did not want to accompany Appellant to Carnegie to address their relationship, a rejection which, according to Appellant, prompted him to remove the victim from the car.

■ We recognize that hearsay evidence concerning the victim's state of mind is admissible only where the victim's state of mind is a "factor in issue" at trial. *Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1061 (2001). Appellant's trial counsel, when presented at the PCRA

hearing with Appellant's argument that *Laich* and "the Rules of Evidence" supported a finding that the victim's statement to Branaugh inadmissible, testified:

> The prosecution's theory, as I understood it at the time, was that the [victim] was being held against her will, and that goes to the question of whether she voluntarily left the car, and again, it's all tied into the root question of causation, and the [trial] [c]ourt made it clear that it was going to hold admissible anything that tended to show what her state of mind was at the time of the incident, and in fact, what her state of mind might have been remote to the incident.

N.T., 1/11/11, at 7.

We similarly do not find that *Laich* supports Appellant's contention that the victim's statements concerning her fear and apprehension of Appellant were inadmissible hearsay. In *Laich*, the defendant admitted his guilt, and therefore our Pennsylvania Supreme Court determined that the victim's statements regarding defendant's jealous threats to kill her were "simply not relevant given appellant's defense" of sudden provocation. *Laich*, 777 A.2d at 1062. In contrast, Appellant has repeatedly denied his guilt, has not claimed any sudden provocation relative to the victim, and has denied acting with malice.

■ Even if we accept Appellant's contention that the victim's statement that she feared Appellant and that Appellant was going to harm her was irrelevant to the disputed issues of causation or malice, we conclude that the hearsay statement was merely cumulative of other evidence discussed more fully below, and was harmless error. *See Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248, 251–252 (1981) (While the trial court erred in admitting statement that murder victim carried a gun for protection against defendant and

his siblings who were "after" victim because "the victim's state of mind was not a matter in issue in the case," the admission was harmless error due to the overwhelming evidence of the appellant's guilt and the lack of support for the appellant's defenses of self-defense and provocation.).

■ With respect to Branaugh's testimony regarding the victim's cell phone call that occurred while she was riding in the car with Appellant, Branaugh testified that the victim was crying when she called him, and that she said she was scared and that Appellant was "trying to kill" her. N.T., 3/15–19/04, at 102. Pennsylvania Rule of Evidence 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The Pennsylvania Supreme Court has explained that "it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event." *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 496 (2009), *cert denied*, 559 U.S. 1111, 130 S.Ct. 2415, 176 L.Ed.2d 932 (2010) (internal citation omitted).

Here, Branaugh testified that as the victim was crying and telling him that Appellant was "trying to kill" her, he could hear Appellant in the background "cussing and screaming at her," saying "[y]ou bitch, mother f[ ]er and I'm going to kill you, bitch...." N.T., 3/15–19/04, at 102. Thus, the victim's statement to Branaugh was made at a time when she believed that Appellant was trying to hurt her, regardless of whether Appellant was actually trying to kill her. As such, we agree with the trial court that the victim's statement in the car qualifies as an "excited utterance,"

and therefore, trial counsel was not ineffective for failing to object to the admissibility of this testimony. Accordingly, since we find that Appellant was not prejudiced by the admission of this testimony, this ineffectiveness claim fails.

■ Appellant additionally argues that trial counsel was ineffective for failing to cross-examine Branaugh with a prior inconsistent statement he gave to Pennsylvania State Trooper Pierre Wilson the day after the victim was killed. Trooper Wilson memorialized the statement in his Homicide Investigation Report as follows:

On 01/29/03 at approx. 1205 hrs. I received a call from Eric Maurice BRANAUGH.... BRANAUGH related the following. I was dropped off by the Uni–Mart on Fifth Ave. in Coraopolis by a friend after work. I guess this was around 10–10:30 P.M. on 01/27/03. As I started walking toward home, [the victim] pulled up and asked me to hang out with her. She was alone and said she was afraid that [Appellant] was going to hurt her or do something real bad to her. I told her that I was just getting off of work and needed to go home and get a shower. I told her to call me later and maybe I'll come back out. At that point she drove away. At approx. 11:30 P.M.—12:00 (Mid–Night) [the victim] called me back from a cell phone. She asked me if I would come out and have a beer with her. I said aren't you pregnant? She said yes, but I'm really scared and nervous. I noticed that she was crying and her voice was trembling. She sounded drunk, slurring and such. I told her that I was in bed and that I wasn't coming back out. I hung the phone up and *that was the last time I heard from her.*

No Merit Letter, dated 2/28/08, Exhibit, Homicide Investigation Report (emphasis supplied).

■ Branaugh's statement to Trooper Wilson did not include an account of the cell phone call from the victim in which he could hear Appellant screaming at her as she was crying and telling Branaugh that Appellant was "trying to kill" her. Pennsylvania Rule of Evidence 613 provides, in relevant part:

A witness may be examined concerning a prior *inconsistent* statement made by the witness, whether written or not, and the statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents shall be shown or disclosed to opposing counsel.

Pa.R.E. 613(a) (emphasis in original). This Court has clarified that "[m]ere dissimilarities or omissions in prior statements ... do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." *McManamon v. Washko*, 906 A.2d 1259, 1268 (Pa.Super.2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007), *quoting Commonwealth v. Bailey*, 322 Pa.Super. 249, 469 A.2d 604, 611 (1983).

Here, even if Branaugh had been cross-examined on his failure to inform Trooper Wilson regarding the sum and substance of the victim's call, this omission would not have cast substantial doubt on the veracity of Branaugh's trial testimony because: (1) the 911 tapes which were played for the jury independently established that the male in the car with the victim was assaulting the victim and threatening to kill her; (2) Appellant's statements to police established that he was the male in the car with the victim and that their argument had been intense; and (3) Dr. Rozin's testimony documented the violent nature of the argument based on the physical evidence of manual assault and strangulation

on the victim's body. Moreover, we do not find that a cross-examination by trial counsel regarding discrepancies would have been outcome-determinative because the variances can be explained by the circumstances surrounding the report's preparation, and the recordings of the 911 calls, which we deemed properly admitted during Appellant's direct appeal, are cumulative to Branaugh's testimony. *See Commonwealth v. Williams,* 587 Pa. 304, 899 A.2d 1060, 1063 (2006) (a showing of prejudice is required to prove ineffective assistance of counsel).

■ Moreover, in *McManamon,* we explained:

"[A] summary of a witness' statement cannot be used for impeachment purposes absent adoption of the statement by the witness as his/her own." *Id.* [*Commonwealth v. Woods,* 710 A.2d 626 (Pa.Super.1998)] The rationale for this rule is: "[I]t would be unfair to allow a witness to be impeached on a police officer's interpretation of what was said rather than the witness' verbatim words." *Commonwealth v. Simmons,* 541 Pa. 211, 245, 662 A.2d 621, 638 (1995).

*McManamon,* 906 A.2d at 1268. In this case, trial counsel conceded that Trooper Wilson's report was a "summary [of a] phone conversation," and it did not "appear that [Branaugh] himself had signed ... adopted ... or reviewed it in any manner." N.T., 1/11/11, at 44–45. Given the foregoing, we do not find that the omission of information by Branaugh as reflected in the police report was "substantial enough to cast doubt on [Branaugh's] testimony." *McManamon,* 906 A.2d at 1268. Additionally, Trooper Wilson's homicide investigation report was merely a summary of the telephone conversation, was not a formal witness examination, and Trooper Wilson's record of same was not

written or signed by Branaugh. *See* Homicide Investigation Action Report, Incident No. B3–1306859, 1/29/03, at 1. Accordingly, these factors militate against any inconsistencies between Trooper Wilson's summary of his conversation with Branaugh and Branaugh's trial testimony, and thus undermine Appellant's claim that trial counsel was ineffective for not cross-examining Branaugh on possible inconsistencies. *See Commonwealth v. Foglia,* 979 A.2d 357, 362–363 (Pa.Super.2009) (*en banc*) (counsel not ineffective for failing to cross-examine witness with inconsistencies between police report and testimony where report was cursory and non-chronological outline of facts).

■ In his third issue, Appellant contends that his direct appeal counsel was ineffective for failing to challenge the trial court's admission of Wife's testimony on behalf of the Commonwealth. Appellant contends that his wife testified to confidential communications in violation of 42 Pa. C.S. § 5914, which provides that "in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial."

Prior to Wife's testimony, trial counsel objected to the admission based upon the spousal privilege set forth in Section 5914. The Commonwealth countered that Section 5914 had to be read in conjunction with 42 Pa.C.S. § 5913. Specifically, Section 5913 reads, in relevant part,

Except as otherwise provided in this subchapter, in a criminal proceeding a person shall have the privilege, which he or she may waive, not to testify against his or her then lawful spouse except that there shall be no such privilege:

\* \* \*

(4) in a criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape.

42 Pa.C.S. § 5913(4). Over trial counsel's objection, Wife was permitted to testify for the Commonwealth.

Wife testified that she and Appellant were married in July of 1999, and separated in March of 2002. She stated that in the early morning hours of January 28, 2003, she received a phone call from Appellant in which he asked her "will you still love me no matter what I did," to which she responded "yes." N.T., 3/15–19/2004, at 132. Although she asked him what he was talking about, Appellant would not tell her. Wife testified that she saw Appellant later that evening at his mother's house, and that he was "leaning over [a] bed with his hands over his face and his knees on the floor." *Id.* at 136. Again, she asked him what was wrong, and he refused to answer her. *Id.*

In *Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549 (2009), the Pennsylvania Supreme Court clarified that Sections 5913 and 5914 "are separate rules, and § 5913's exception preventing a spouse from asserting the privilege in certain criminal proceedings does not trump § 5914." *Id.* at 561. Section 5914 renders a spouse incompetent to testify against another spouse in a criminal prosecution regarding confidential communications. The privilege set forth in Section 5914 is personal to the defendant spouse, and therefore, "waivable only by the spouse asserting the privilege." *Id.* at 561 (holding that wife could not waive Section 5914 privilege in prosecution against husband).

When considering whether appellate counsel had a reasonable basis for her actions, "we do not question whether there were other more logical courses of action which counsel could have pursued: rather, we must examine whether counsel's decisions had any reasonable basis." *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 799 (2007). "We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that 'an alternative not chosen offered a potential for success substantially greater than the course actually pursued.' " *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 442 (2011) (citation omitted).

During the PCRA hearing, appellate counsel acknowledged that she had initially included the spousal immunity challenge in her concise statement of reasons relied upon for appeal. N.T., 1/11/11, at 53. However, she decided to omit the issue from the appellate brief because she felt that it was not as strong an argument as the other three issues she included in her brief. *Id.* She admitted that she believed the claim "might have merit," but that "it might be harmless error" and "wasn't that important to the ultimate issue." *Id.* at 54. We agree. *See Commonwealth v. Showers*, 782 A.2d 1010, 1016 (Pa.Super.2001) (internal citations omitted) ("It is the obligation of appellate counsel to present issues, which in counsel's professional judgment, 'go for the jugular' and . . . not [to] get lost in a mound of other colorable, nonfrivolous issues which are of lesser merit.").

We recognize that "[c]ommunications between spouses are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption." *Commonwealth v. McBurrows*, 779 A.2d 509, 514 (Pa.Super.2001) (internal citation omitted). The privilege under 42 Pa.C.S.A. § 5914 prevents a spouse from testifying against the declarant-defendant spouse regarding "any communications which were confidential w

hen made and which were made during the marital relationship." *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335, 1341–1342 (1995) (footnote omitted) (emphasis supplied). Our Supreme Court explained that "[t]he Court in *May* recognized that the question of what is a 'confidential' communication turns in part on the reasonable expectation the declarant has that the communication will remain confidential." *Commonwealth v. Spetzer*, 572 Pa. 17, 813 A.2d 707, 722 (2002).

Here, the record shows that Appellant and his wife were separated prior to January 28, 2003, when the victim was killed, and that their contact was centered on their children. N.T., 3/15–19/04, at 130–131. Wife had not even spoken with Appellant for a month prior to Appellant calling her on January 28, 2003. *Id.* at 132. Appellant was involved in a romantic relationship with the victim, who had told Bell that Appellant was the father of her unborn child. Appellant utilized a cell phone that did not belong to him to call his wife. Further, Wife was living with her sister when Appellant called her. *Id.* at 131. The state of the marital relationship, the lack of regular contact between the spouses, and the way Appellant contacted his wife, weighs against an expectation of confidentiality by Appellant concerning his statement to Wife. *See Burrows*, 779 A.2d at 514. Indeed, we find that the "nature of the communication [was] not imbued with an aura of a sharing disclosure precipitated largely due to the closeness spouses share," and therefore the statement was not privileged. *Id.* at 514. We also note that Wife's observation of Appellant's act of kneeling with his head in his hands did not involve any communication at all. Moreover, Appellant's implication to his wife that he had done something wrong was merely cumulative of other trial evidence, such that the admission of Wife's testimony did not prejudice Appellant.

Prejudice requires proof that "but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Commonwealth v. Johnson*, 27 A.3d 244, 247 (Pa.Super.2011) (internal citations omitted).

 We have explained:

[A]n error may be considered harmless only when the Commonwealth proves beyond a reasonable doubt that the error could not have contributed to the verdict. Whenever there is a "reasonable possibility" that an error "could have contributed to the verdict," the error is not harmless.

*Commonwealth v. Koch*, 39 A.3d 996, 1006–1007 (Pa.Super.2011) (internal citation omitted). In *Small, supra*, our Supreme Court expressed that "[e]ven if privileged testimony under [42 Pa.C.S.A.] § 5914 is erroneously admitted into evidence, it is harmless error if it is merely cumulative of other admissible testimony." *Small*, 980 A.2d at 562 (internal citation omitted). Likewise, we expressed that the "properly admitted testimony" of a third party regarding the topic of declarant-defendant's disclosures to his spouse, "rendered [testifying spouse's] testimony cumulative on that particular point ... [and] [t]hus, any error possibly associated with the admission of [testifying spouse's testimony] ... was harmless." *Commonwealth v. Reese*, 31 A.3d 708, 720 (Pa.Super.2011) (internal citation omitted). Here, Trooper Scott testified that he observed Appellant in a similarly penitent position after Appellant learned from Trooper Scott that the victim had been struck in the roadway where Appellant had removed her from the car. *See* N.T., 3/15–19/04, at 402. Specifically, Trooper Scott indicated that Appellant "just held

his head in his hands and didn't say anything else." *Id.*

The record contains overwhelming evidence of Appellant's guilt, which militates against a finding that the outcome of the trial would have changed if Wife's testimony had been excluded. Appellant admitted that the victim was in his car the night of her death. Branaugh's testimony, which we deem admissible, was that Appellant was arguing with, and "cussing and screaming" at the victim while she was in the car. Appellant admitted leaving the victim on the interstate where she was later found dead. The victim's 911 call from the car records Appellant saying he has "nothing to lose" and that he was going to "power blast" the victim—statements which show the malice necessary for Appellant's murder convictions. N.T., 3/15–19/04, at 216. The victim's hair was found in the undercarriage of the car, indicating Appellant may have run over the victim with the vehicle. *Id.* at 487. There was additionally forensic evidence and medical testimony about strangulation marks on the victim's neck, and of her having sustained bruises to her arms, chest, and abdominal area the night of her death. *Id.* at 329–353. Given the overwhelming evidence of Appellant's guilt, we conclude that even if Wife's testimony was inadmissible, the admission of her testimony at trial did not constitute harmful error entitling Appellant to a new trial.

Appellant's fourth issue asserts that trial counsel was ineffective for failing to retain a forensics expert to counter the Commonwealth's theories: (1) that Appellant struck the victim with his car before Caleffi struck her, and (2) that the victim was lying on the roadway when Caleffi struck her. In order to demonstrate counsel's ineffectiveness for failure to call a witness, a petitioner must prove that "the witness[ ] existed, the witness

[was] ready and willing to testify, and the absence of the witness['] testimony prejudiced petitioner and denied him a fair trial." *Johnson,* 27 A.3d at 247 (internal citation omitted). In particular, when challenging trial counsel's failure to produce expert testimony, "the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence." *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 745 (2004) (internal citation omitted). Also, "[t]rial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." *Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 253 (1998); *accord Commonwealth v. Williams,* 537 Pa. 1, 640 A.2d 1251, 1265 (1994). Finally, "trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony which was presented by the prosecution." *Copenhefer,* 719 A.2d at 253, n. 12.

Appellant has failed to identify any forensics expert who would have provided testimony to counter the Commonwealth's theory of the case. Our review of the record reflects that trial counsel effectively cross-examined the Commonwealth's forensic expert. Significantly, trial counsel stated that he had "specifically questioned [Dr. Rozin] . . . and brought to his attention differences in his testimony or changes that he had made in his testimony . . . between March 7, 2003, which was the Coroner's inquest and at trial[.]" N.T., 1/11/11, at 49. Moreover, trial counsel testified that he met with Dr. Rozin in preparation for trial to specifically discuss the positioning of the victim's body. *Id.* at 15. Trial counsel testified that, after their conversation, he "was convinced that the evidence showed that [the victim] was in fact

lying on the ground when she was run over." *Id.* at 16. Trial counsel thus had a reasonable basis for not retaining a forensics expert to dispute the positioning of the victim's body. Without any offer of proof, Appellant cannot demonstrate that the absence of proposed expert testimony denied him a fair trial, and this claim fails.

▮▮▮▮ Appellant's fifth issue focuses on trial counsel's failure to object to purported prosecutorial misconduct during the Commonwealth's closing argument to the jury. Specifically, Appellant challenges the following portion of the Commonwealth's closing argument:

> Those tire tracks on the right side of her body most likely are Caleffi's. You look at the picture of her left arm. You are allowed to use your common sense. You don't need an expert to tell you that those tracks are going in the other direction. Her arm is broken in two places. It's not an unlikely and reasonable [sic] inference from this evidence that the car was stopped. He [Appellant] was choking her, beating her, whatever was going on, had her over the side of the car. One of her hairs got up under the undercarriage. He put her out and ran over her arm and sped away and then along comes Caleffi. There is no question that she was out of that car there and she didn't go anywhere.

N.T., 3/15–19/04, at 487.

▮▮▮▮ It is well established that a prosecutor is permitted to "vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence." *Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 907 (2009), *cert. denied*, —— .U.S. ——, 131 S.Ct. 77, 178 L.Ed.2d 50 (2010).

> In considering a claim of prosecutorial misconduct, our inquiry is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one. Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect … [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Further, the allegedly improper remarks must be viewed in the context of the closing argument as a whole.

*Id.* at 907 (internal citations omitted).

Trial counsel testified that he did not object to the prosecutor's argument because "[trial counsel] felt it was [the prosecutor's] right to make such an argument as to what he wanted the jury to interpret from the evidence and it was proper." N.T., 1/11/11, at 18. Following review, we agree and conclude that the prosecutor's argument constituted a fair inference based upon the evidence presented at trial. For example, the Commonwealth presented evidence that a hair, found on the underside of the Toyota Camry, matched the victim's DNA. *See* N.T., 3/15–19/04, at 258–260 (testimony of accident reconstructionist) and at 321–323 (testimony of forensic examiner). Furthermore, although Dr. Rozin testified that the victim's body showed two major areas of compression related to car tires, the "[m]id and upper torso," he also stated there was a tire compression on "[o]ne of the upper extremities." *Id.* at 354; 362 (referring to "pattern injuries" on the victim's left upper extremities). Since we conclude the Commonwealth's closing argument was a fair inference based upon the evidence presented at trial, Appellant's claim lacks merit.

▮▮▮▮ In his sixth issue, Appellant contends that both trial and appellate counsel were ineffective for failing to raise a challenge to the weight of the evidence.

"The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (internal citations omitted). A challenge to the weight of the evidence, therefore, must first be addressed to the discretion of the trial judge, who had the opportunity to see and hear the evidence presented. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 753 (2000); *see also* Pa.R.Crim.P. 607 (weight of evidence claim must be raised with trial judge either orally before sentencing, by written motion before sentencing, or in post sentence motion). To grant a new trial based upon the weight of the evidence, "it must appear [to the trial court] that the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa.Super.2004), *appeal denied*, 583 Pa. 689, 878 A.2d 864 (2005) (internal citation omitted). When a challenge to the weight of the evidence is raised on appeal, "our role ... is not to consider the underlying question of whether the verdict is against the weight of the evidence, but is limited to determining whether the trial court abused its discretion in ruling on the weight of the evidence claim." *Commonwealth v. Wall*, 953 A.2d 581, 586 (Pa.Super.2008), *appeal denied*, 600 Pa. 733, 963 A.2d 470 (2008) (internal citation omitted).

 Since no challenge to the weight of the evidence was raised before the trial court either before sentencing or in a post-sentence motion, appellate counsel was precluded from raising a challenge on appeal, as any claim would have been waived. *See* Pa.R.Crim.P. 607. Thus, appellate counsel was not ineffective. With regard to trial counsel, during the PCRA hearing, trial counsel testified about his reasons for not challenging the weight of the evidence:

I didn't raise a weight of the evidence claim basically because I believed that in addition to the evidentiary issues raised, the real issue here was probably framed as the sufficiency of the evidence. It wasn't so much a misapprehension of the facts by the fact finder. I was more concerned that it was a misapplication of the law.

N.T., 1/11/11, at 19.

Trial counsel articulated a reasonable basis for not raising a weight claim. Moreover, the PCRA court determined that even if the claim had been raised, it would have found that "the jury's verdict was not so contrary to the evidence as to shock one's sense of justice" and that it "would **not** have granted a new trial on a weight of the evidence argument." PCRA Court Opinion, 2/28/11, at 4–5 (emphasis supplied). Therefore, Appellant is not entitled to relief on this claim.

In his seventh issue, Appellant criticizes both trial and appellate counsel for their failure to object to the testimony of witness Robert Pennybaker. Specifically, Appellant argues that trial counsel was ineffective for failing to challenge Pennybaker's testimony relative to prior bad acts, and that appellate counsel was ineffective for failing to challenge the trial court's ruling permitting Pennybaker to testify.

Pennybaker lived in the same apartment building as Bell. He knew the victim and Appellant. Pennybaker testified that when Bell would leave for work, often for days at a time, Appellant would come to the apartment while the victim was there. Pennybaker also testified that approximately "six or seven times" between July

of 2002 and January of 2003, he heard the couple arguing:

> The fighting went on mainly during late night. They would come back from the bar and they would be outside or downstairs arguing and I really didn't hear what the argument was about, but they would be down there fighting and arguing.

N.T., 3/15–19/04, at 50. Trial counsel objected to Pennybaker's testimony as irrelevant, but the Commonwealth argued that testimony went to "the tumultuous nature and history of the relationship . . . [t]o the malice, the ill will, hostility." *Id.* at 49. The trial court overruled defense counsel's objection.

 Appellant contends that trial counsel should have specifically objected to Pennybaker's testimony as inadmissible evidence of Appellant's prior bad acts. "It is axiomatic that evidence of prior crimes [or bad acts] is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Jackson,* 900 A.2d 936, 940 (Pa.Super.2006) (internal citations omitted). *See* Pa.R.E. 404(b)(1). However, it is well-settled that such evidence may be admissible for other purposes such as proof of motive or identity. *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 419 (2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1613, 173 L.Ed.2d 1000 (2009); *see also* Pa.R.E. 404(b)(2).

We conclude there is no merit to Appellant's argument. Indeed, we fail to see how Pennybaker's testimony could be characterized as evidence of "prior bad acts." Pennybaker merely testified that Appellant and the victim often argued. While Appellant asserts that this testimony tended to convey to the jury that he

was a "violent person [who] likely physically abused [the victim]," Appellant's Brief at 44, nothing in Pennybaker's description of the couple's arguments referenced physical abuse or violence. Trial counsel strategically objected to Pennybaker's testimony on the basis of relevance, which was a proper, albeit ultimately unsuccessful, argument.

Further, with respect to Appellant's claim that appellate counsel was ineffective for failing to challenge the trial court's admission of this evidence, we similarly conclude that Appellant is entitled to no relief. *See Powell,* 956 A.2d at 406, 419 ("Rulings on the admissibility of evidence are within the discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion."). Appellant has not demonstrated the trial court's ruling was an abuse of discretion, or that he was prejudiced by the admission of Pennybaker's testimony. It was undisputed at trial that the victim was romantically involved with Appellant, although she still lived with and maintained a relationship with Bell. Moreover, Smith's testimony of his encounter with Appellant the evening of January 27, 2008 at the Chez Lounge, portrayed Appellant as angry and potentially violent. *See* N.T., 3/15–19/04, at 111–114. Therefore, Appellant has failed to prove that the trial court erred in admitting Pennybaker's testimony, or that he was unduly prejudiced by the admission of that testimony.

 Appellant in his eighth issue asserts that trial counsel was ineffective for failing to file a motion to suppress the statements he made to police while being transported to the police station on the evening of January 28, 2003.[2] It is axio-

---

**2.** Appellant subsequently provided a taped statement to police after waiving his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He has not challenged the admissibility of the taped statement.

matic that statements obtained during a "custodial interrogation" are presumptively involuntary unless the suspect first receives *Miranda* warnings. *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa.Super.2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002).

> Custodial interrogation has been defined as questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Further, an "interrogation" occurs when the police "should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." *Miranda* warnings must precede a custodial interrogation.

*Commonwealth v. Clinton*, 905 A.2d 1026, 1032 (Pa.Super.2006), *appeal denied*, 594 Pa. 685, 934 A.2d 71 (2007) (internal citations and emphasis omitted).

■ Appellant offers no meaningful argument that he was subjected to a "custodial interrogation" during the ride to the police station. In fact, Appellant simply asserts that "[t]rial counsel should have filed a motion to suppress the highly inculpatory and prejudicial statements to police since Defendant was a suspect and was being questioned about the homicides and never given *Miranda* warnings." Appellant's Brief at 47. We disagree. At Appellant's request, his sister was permitted to accompany him to the police barracks. N.T., 3/15–19/04, at 396–397. Trooper Scott described Appellant as "very cooperative." *Id.* at 396. Our review of the record further reveals that Appellant (1) voluntarily agreed to accompany Trooper Scott to the state police barracks for questioning, and (2) initiated a conversation in the patrol car regarding the events of the previous evening. Specifically, en route to the police barracks, Appellant asked Trooper Scott if "this [was] about the girl

that got hit on 60 last night," to which the trooper replied, "yes, sir." *Id.* at 399. Trooper Scott described their subsequent conversation:

> He [Appellant] then stated was it [the victim]. Was the girl pregnant? The girl was pregnant. It was [the victim] because she's pregnant with my seven month old son. I explained to him that I was only to transport him to the barracks and he would be questioned further when he got to the barracks. I told him we were trying to find out a time line for her the night before, ascertain her whereabouts, who she was with. If that is all you need to know, I can tell you that. She was with me last night. We were partying in Coraopolis. We went over to Chester Bell's house to get some money for crack. [The victim] had then left [Appellant] at Chester Bell's house.

*Id.* Appellant proceeded to detail the events of the prior evening, including the fact that, while they were on Route 60, he "put [the victim] out of the car." *Id.* at 400. In fact, Appellant showed Trooper Scott where he left the victim, since the drive from Appellant's residence to the police barracks passed the site of the incident. Trooper Scott further testified that as they neared the police barracks, Appellant "turned and asked me where did the girl get hit last night and I said right where you put [the victim] out of the car." *Id.* at 402. Trooper Scott stated that Appellant then "just held his head in his hands and didn't say anything else." *Id.*

Trooper Scott's testimony indicates that Appellant was not subject to a custodial interrogation when he spoke to Trooper Scott in the patrol car. Appellant agreed to go to the police barracks for questioning, he was not handcuffed, and he was accompanied by his sister. More importantly, Trooper Scott did not initiate any

questioning of Appellant. Rather, Appellant asked Trooper Scott about the woman who was hit by the car. In response, the trooper explained that Appellant would be questioned at the barracks, and that the officers wanted to establish a timeline for the victim's whereabouts the prior evening. We do not conclude that Trooper Scott's innocuous comment was "reasonably likely to elicit an incriminating response" from Appellant. *Clinton*, 905 A.2d at 1032. Thus, Appellant's comments to the trooper were unsolicited and gratuitous. *See Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa.Super.1999) ("When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as gratuitous, and is not subject to suppression for lack of warnings."). Accordingly, counsel cannot be found ineffective for failing to pursue this baseless suppression claim.

In his ninth issue, Appellant claims that trial counsel was ineffective for presenting a "frivolous and meaningless defense." Appellant's Brief at 48. Appellant's one paragraph "argument" on this issue consists of his bald allegation that counsel failed to demonstrate that Caleffi's actions, in striking the victim with his vehicle, constituted a superseding/intervening cause that "interfered with the events that [Appellant] initiated." *Id.* Appellant provides no citation to relevant authority. Appellant's only citations are to the PCRA statute, and a case which sets forth the standard for reviewing an ineffectiveness claim under the PCRA. *See* Appellant's Brief at 48. Further, Appellant does not provide any explanation as to how trial counsel could have better presented this defense. Thus, this claim is waived. *See Commonwealth v. Johnson,* 604 Pa. 176,

985 A.2d 915, 924 (2009), *cert. denied,* —— U.S. ——, 131 S.Ct. 250, 178 L.Ed.2d 165 (U.S.2010) (finding capital defendant waived two challenges to evidentiary rulings that failed to provide any discussion of claims, reasoned development of why testimony was prejudicial, and citation to authority).

Appellant's eleventh issue argues that trial counsel was ineffective for failing to impeach Dr. Rozin with prior testimony that he had provided at the coroner's inquest. Dr. Rozin's trial testimony regarding the victim's cause of death was consistent with his testimony at the coroner's inquest—the victim died as a result of trauma to her head and chest, not as a result of the neck injury. *See* N.T., 3/15–19/04, at 354. However, at trial, Dr. Rozin testified that the victim was "compromised" when she was out of the car by two factors, compression of her neck (allegedly caused by Appellant having strangled her in the car) and alcohol intoxication. *Id.* at 352. Appellant emphasizes that during the coroner's inquest in March of 2003, Dr. Rozin testified that the victim did not die from the neck injury, and was not "compromised by the injury." [3] Appellant's Brief at 49.

Our review of trial counsel's cross-examination of Dr. Rozin reveals that counsel did impeach Dr. Rozin with his testimony from the coroner's inquest. Indeed, trial counsel confronted Dr. Rozin with his prior testimony that the victim did not die as a result of the manual neck injury, and that the injury would not have prevented her from walking. *See* N.T., 3/15–19/04, at 347–348. Moreover, Dr. Rozin admitted that he had previously testified that the victim was "not incapacitated" by her neck injury and alcohol intoxication. *Id.* at 353.

---

**3.** It bears mention that the notes of testimony from the coroner's inquest are not included in the certified record. However, there is no disagreement between the parties as to the content of Dr. Rozin's testimony at the coroner's inquest.

He acknowledged that, since the time of the coroner's inquest, he had "thought a lot about this testimony" and came to the conclusion that the victim was "compromised by alcohol intoxication and compression of the neck." *Id.* Thus, contrary to Appellant's assertion, trial counsel did attempt to impeach Dr. Rozin with his prior testimony from the coroner's inquest. That the impeachment was ultimately unsuccessful is not grounds for a new trial. Accordingly, no relief is warranted.

■ In his twelfth issue, Appellant claims trial counsel rendered ineffective assistance when he failed to object to the introduction of telephone records that had not been properly authenticated. Preliminarily, we note that while Appellant ostensibly challenges the introduction of telephone records from the cell phones of Wife, Appellant, and Branaugh, the record, as cited by Appellant, reveals only the admission of the records from Wife's cell phone and from the cell phone that Appellant was using on the night of the incident. *See* N.T., 3/15–19/04, at 371–377. Thus, Appellant's allegation concerning the admission of the records from Branaugh's cell phone is moot. Moreover, while trial counsel admitted at the PCRA hearing that he "didn't make an independent investigation or inquiry" regarding the authenticity of the cell phone records, N.T., 1/11/11, at 35, Appellant offers no evidence or argument that the records admitted at trial were **not** authentic. Indeed, he does not even assert, let alone prove, that the telephone records admitted at trial did not accurately reflect the calls made and received from those cell phones. Furthermore, Wife testified that she received two phone calls from Appellant in the early morning hours of January 28, 2003. N.T., 3/15–19/04, at 132–134. Trooper Wilson confirmed that he saw the telephone number of the cell phone Appellant was using

on Wife's caller ID. Therefore, Appellant has failed to demonstrate that he was prejudiced by trial counsel's failure to object to the admission of the cell phone records, and he is entitled to no relief.

Finally, Appellant in his thirteenth issue offers the generalized argument that trial counsel was ineffective for "failing to challenge the causation rule at every level of trial." Appellant's Brief at 53. Appellant contends that Caleffi's "unlawful act" in striking the victim with his car, was a "superseding and/or intervening cause that broke the chain of events" so that Caleffi should have been held solely responsible for the victim's death. *Id.* However, as the PCRA court correctly explained, trial counsel raised the " 'superseding cause' issue at all stages of the case," including "at the preliminary hearing, in pre-trial motions, in post-trial motions, and on appeal." PCRA Court Opinion, 2/28/11, at 7. No relief is warranted on this claim.

Based on the foregoing, we conclude that Appellant is not entitled to a new trial based upon his thirteen claims of the ineffective assistance of trial and appellate counsel. Accordingly, we affirm the order of the PCRA court.

Order affirmed.

Judge GANTMAN concurs in the result.

Judge OTT files a concurring and dissenting opinion in which Judge DONOHUE and Judge WECHT join.

## CONCURRING AND DISSENTING OPINION BY OTT, J.:

Although I agree with the Majority that most of Luster's thirteen claims of ineffective assistance of counsel have no merit, I disagree that two of his issues are meritless and/or constitute harmless error and would grant Luster a new trial. Therefore, I must dissent.

The issues [1] upon which I disagree with the Majority are as follows: (1) The PCRA court erred in determining trial counsel was not ineffective for failing to cross-examine Eric Branaugh regarding a prior inconsistent statement to the police regarding a subsequent phone call he received from the decedent, and (2) Appellate counsel was ineffective for failing to challenge the testimony of Appellant's wife regarding comments that he allegedly made to her following the incident with Ms. Karcher.[2]

Luster was convicted of two counts of third-degree murder, regarding the death of Christine Karcher and her unborn child. The Commonwealth's theory was that Luster was angry with Karcher. He forced her into a car and attempted to take her to her apartment in Carnegie [3] so they could address problems in their relationship. In the course of their argument, and while in Luster's car, Luster physically assaulted Karcher. When she refused to accompany him to Carnegie, knowing she was intoxicated, he forced her from the vehicle. As he left her lying on the side of the road, he ran over her right arm, breaking it. He left her there, unattended. Later, another motorist, who was apparently intoxicated,[4] ran over her chest and head as she lay in the road, killing her.

Murder is defined, in relevant part, at 18 Pa.C.S. § 2502, as follows:

(c) **Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502(c).

The requirements for proving third-degree murder are set forth in case law. "Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Kling*, 731 A.2d 145, 147 (Pa.Super.1999).

Malice exists where there is a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Pigg*, 391 Pa.Super. 418, 571 A.2d 438, 441 (1990), *appeal denied*, 525 Pa. 644, 581 A.2d 571 (1990) (quoting *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)). Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *See Commonwealth v. Scales*, 437 Pa.Super. 14, 648 A.2d 1205, 1207 (1994), *appeal denied*, 540 Pa. 640, 659 A.2d 559 (1995) (regarding third degree murder). A defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the

---

1. These issues are numbered two and three in Luster's brief.

2. "To prove counsel ineffective, the petitioner must demonstrate that: (1) the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the petitioner was prejudiced by counsel's act or omission." *Commonwealth v. Champney*, —— Pa. ——, 65 A.3d 386 (2013).

3. Although Karcher had lived with Chester Bell for ten years, at the relevant time period, Karcher had also rented an apartment in Carnegie. See N.T. Trial, 3/15/04, at 90.

4. This other motorist was arrested but his blood alcohol content was not obtained until after the two hour statutory time requirement had passed. Therefore, it was never legally established that he was intoxicated.

very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result. *See* [*Commonwealth v.*] *O'Hanlon, supra* [539 Pa. 478], 653 A.2d [616] at 618 [ (1995) ] (regarding aggravated assault).

*Id.* at 147–148.

Since Luster was not the actual cause of Karcher's death, the Commonwealth was required to prove beyond a reasonable doubt that Luster displayed a "conscious disregard [that] almost certain death or serious bodily injury" would result from permitting or forcing Karcher to exit the car. *Id.* Because the evidence presented at trial was contradictory as to how the decedent exited the car and speculative as to how she came to be lying in the middle of the road, evidence of malice was critical to the determination of guilt.

The Commonwealth argued that malice was demonstrated through the testimony of Eric Branaugh, Michael Smith and the 9–1–1 recording.[5]

Luster argues that trial counsel was ineffective for failing to cross-examine Branaugh with a prior inconsistent statement he gave to Pennsylvania State Trooper Pierre Wilson the day after Karcher was killed. Trooper Wilson memorialized the statement in his Homicide Investigation Report as follows:

On 01/29/03 at approx. 1205 hrs., I received a call from Eric Maurice BRANAUGH.... BRANAUGH related the following. I was dropped off by the Uni–Mart on Fifth Ave., in Coraopolis by a friend after work. I guess this was around 10–10:30 P.M. on 01/27/03. As I started walking toward home, Christine [Karcher] pulled up and asked me to hang out with her. She was alone and said she was afraid that Aaron [Luster] was going to hurt her or do something real bad to her. I told her that I was just getting off of work and needed to go home and get a shower. I told her to call me later and maybe I'll come back out. At that point she drove away. At approx. 11:30 P.M.—12:00 (Mid–Night) Christine called me back from a cell phone. She asked me if I would come out and have a beer with her. I said aren't you pregnant? She said yes, but I'm really scared and nervous. I noticed that she was crying and her voice was trembling. She sounded drunk, slurring and such. I told her that I was in bed and that I wasn't coming back out. I hung the phone up and *that was the last time I heard from her.*

No Merit Letter, dated 2/28/2008, Exhibit, Homicide Investigation Action Report (emphasis supplied). Significantly, Branaugh's statement to Trooper Wilson did not include any statement that he could hear Luster screaming at Karcher, as she was crying and telling Branaugh that Luster was "trying to kill" her.

In a written response to this challenge, trial counsel stated he could not remember that line of questioning. At the PCRA

5. Smith provided testimony that approximately three hours prior to her death, he and Karcher were confronted by Luster who was extremely angry and was under the mistaken belief that Karcher and Smith were sexually involved.

The 9–1–1 tape, while clearly demonstrating Luster's anger, does not specifically negate Luster's statement to the police that he slowed or stopped the car and that Karcher left the car of her own will, and reasonably functioning. Further, despite the fact the Luster can be heard on the 9–1–1 tape telling Karcher to "jump" multiple times, when the car door was open while they were driving on Interstate 376, Luster tells her to close the door and apparently pulls her back into the car. It is at this point Karcher says her arm is broken.

hearing, trial counsel provided no further explanation for his inaction.

Pennsylvania Rule of Evidence 613 provides, in relevant part:

> A witness may be examined concerning a prior *inconsistent* statement made by the witness, whether written or not, and the statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents shall be shown or disclosed to opposing counsel.

Pa.R.E. 613(a) (emphasis in original). This Court has clarified that "[m]ere dissimilarities or omissions in prior statements ... do not suffice as impeaching evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." *McManamon v. Washko*, 906 A.2d 1259, 1268 (Pa.Super.2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007), *quoting Commonwealth v. Bailey*, 322 Pa.Super. 249, 469 A.2d 604, 611 (1983).

Although we recognize that a mere omission or dissimilarity in a prior statement does not render a prior statement inconsistent for impeachment purposes, we find that the omission here was "substantial enough to cast doubt on [Branaugh's] testimony." *McManamon*, 906 A.2d at 1268. Indeed, the most damaging part of Branaugh's trial testimony was his description of that 11:30 p.m. cell phone conversation with Karcher. Thus, his failure to mention the occurrence of that phone call, or recall the critical contents of that conversation, to Trooper Wilson **on the day after Karcher's death** would certainly have cast doubt on the reliability of his detailed trial testimony rendered more than one year after the incident. Conse-

quently, trial counsel's failure to cross-examine Branaugh with this prior inconsistent statement cannot be justified on strategic grounds.

Moreover, during the PCRA hearing, trial counsel acknowledged that he was aware of the statement at the time of trial. We can discern no reasonable basis for counsel's failure to cross-examine Branaugh regarding the discrepancy.

Furthermore, I am of the view that trial counsel's omission constituted prejudice. Branaugh's trial testimony that Karcher told him that Luster was "trying to kill" her, as well as Luster's threats and cursing in the background, provided affirmation to the jury of the difficult-to-understand and sometimes inaudible 9–1–1 tape.[6] His testimony that he heard appellant threaten to kill Karcher is in stark contrast to his statement to police that she just asked him to meet for a drink. Thus, there is certainly a "reasonable possibility" that but for counsel's omission, the outcome of the trial would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332–333 (1999) (prejudice in context of ineffectiveness means there is reasonable probability that, but for counsel's error, outcome of proceeding would have differed). Accordingly, I must dissent regarding this issue.

Next, Luster argues appellate counsel was ineffective for failing to challenge the testimony of Luster's wife regarding comments that he allegedly made to her following the incident with Ms. Karcher. The phone call to Cherryl Luster has been argued in this appeal as a demonstration of consciousness of guilt. On its face, this issue has arguable merit since the trial court's purported reason for permitting

---

**6.** We note that the jurors did not have the transcript of the 9–1–1 tape for reference

when they listened to it.

the testimony at trial was erroneous.[7] The trial court presumably allowed the testimony under the mistaken premise that spousal privilege does not apply in a murder trial. *See Commonwealth v. Small,* 602 Pa. 425, 980 A.2d 549 (2009). The PCRA court concluded appellate counsel's decision was properly a part of winnowing issues on appeal. The Majority posits the statements made to Cherryl Luster were not subject to spousal privilege and even if they were, any error in the admission of the testimony was harmless.

While I agree with the Majority's initial analysis of counsel's obligation to raise issues of merit on appeal, I diverge from the Majority's analysis regarding the application of 42 Pa.C.S. § 5914.[8] I also note the Majority has thoroughly set forth the factual predicate for this argument, however, for convenience I will briefly reiterate the facts.

Cherryl Luster testified that she and Luster were married in July 1999, and separated in March 2002. They remained married in the relevant time period although the majority of their contact revolved around their children. Sometime between 1:00 and 1:30 a.m., January 28, 2003, she received a phone call from Luster in which he asked her "will you still love me no matter what I did." N.T. Trial, 3/16/04, at 132. Phone records indicated there were phone calls made from Luster to his wife at 1:18 a.m. and 1:41 a.m. The Commonwealth argued 1:18 a.m. was the time of the relevant phone call. *See* N.T. 3/18/04, at 478. This phone call was made approximately one hour prior to Karcher's demise.

The Majority states spousal immunity is inapplicable because there was no showing of an expectation of confidentiality between Luster and his wife. This determination was based upon the facts that Luster and his wife were separated and their contact was largely limited to interactions regarding their children. *See* Majority at 1045–46.

I agree that the factors listed by the Majority are appropriate in determining the existence of a confidential relationship. However, the message itself, a question whether his wife would still love him no matter what he did, reveals a continuing bond between the two.

> To be protected as a confidential communication, knowledge must be gained through the marital relationship and in the confidence which that relationship inspires.

*Commonwealth v. Dubin,* 399 Pa.Super. 100, 581 A.2d 944, 946 (1990).

Communications between spouses are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption. *Commonwealth v. McBurrows,* 779 A.2d 509, 514 (Pa.Super.2001).

Although separated, Luster and his wife were still married and the substance of the communication, regarding the continuing love of his wife, indicates the confidence that the marriage inspired. Additionally, the evidence showed Luster and his wife had ongoing phone calls until approximately 2:30 in the morning regarding Luster coming to meet his wife. The next day, Cherryl Luster went to Luster's mother's

---

**7.** At trial, the court did not specifically identify the rationale behind its ruling.

**8.** In entirety, Section 5914 states, "Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon trial." 42 Pa.C.S. § 5914.

house to meet him. These actions demonstrate an ongoing relationship between the two. Finally, while the Commonwealth elicited testimony that the two were living apart, there was no testimony there existed any plans to end the marriage.

Further, it bears emphasis that appellate counsel provided no discussion of the mechanics or intricacies of the respective rules in support of her conclusion that the spousal immunity claim "wasn't that important to the ultimate issue." N.T. PCRA Hearing, 1/11/11, at 54. Therefore, I cannot conclude that counsel's decision to omit this issue from direct appeal was reasonable.

Consequently, I must examine the question of prejudice. *See Kimball, supra.* Here, the challenged testimony—specifically, Luster's question to Cherryl, "will you still love me no matter what I did"— was introduced to provide evidence of Luster's consciousness of guilt. The error in admitting this testimony was not harmless. In this case, where the issue of malice was crucial, and the events in the car leading up to Karcher's exit from that vehicle (either willingly or unwillingly) were strongly contested, Luster's apparent admission that he did something that would make him unworthy of his spouse's love would have been important in the jury's deliberation.

Additionally, it bears emphasis that despite Luster's reference to something he had *already* done, this phone call occurred approximately 45 minutes *prior* to Karcher's 9-1-1 call, and approximately one hour *prior* to her demise. Nonetheless, the Commonwealth misconstrued the evidence in its closing argument.

> What did [Cherryl] Luster tell you that this Defendant said to her? Will you love me no matter what I do? Not will you love me no matter what I did. I did something bad here, will you still love me. Will you still love me no matter what I do at 1:18 in the morning? Together with what Eric Branaugh told you. I'm going to kill you, bitch. I'm going to kill you, bitch. Will you still love me no matter what I do? Not the past tense in either instance. I'm going to kill you. Will you love me no matter what I do? That is evidence of intent. That is evidence of malice. That is evidence of murder.

N.T. Trial, 3/18/04, at 478.

Evidence of malice is a critical element of third degree murder. The nature of the admission coupled with the Commonwealth's closing argument demonstrates the high level of prejudice resulting from the introduction of Cherryl Luster's testimony. Accordingly, I would find that Luster is entitled to a new trial on this basis as well.

Lastly, I am compelled to address Luster's first issue in which he claimed counsel was ineffective for failing to object to hearsay testimony of Branaugh; although I agree with the Majority's conclusion that no PCRA relief is due on this claim, I arrive at this conclusion through a different analysis. Specifically, I agree with the Majority that the 11:30 p.m. phone conversation with Karcher was admissible as an excited utterance exception to the hearsay rule under Pa.R.E. 803(2), and, therefore, counsel was not ineffective for failing to object. Likewise, I agree that counsel's failure to challenge the identification of Luster's voice as the speaker was harmless as Luster acknowledged that it was his voice on the 9-1-1 tape. However, I disagree with the Majority's determination that the 10:30 p.m. conversation between Karcher and Branaugh was admissible under Pa.R.E. 803(3), even though I find the admission of this testimony to be harmless error.

Branaugh testified he met Karcher and she told him she had had an argument with Luster and was afraid he "was going to do something real bad to her." She asked Branaugh to stay with her and have a drink to help prevent Luster from taking action. Branaugh declined to stay with Karcher but gave her his cell phone number in the event she needed help later.

An excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Pa.R.E. 803(2). The state of mind exception applies in relevant part to a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health." Pa.R.E. 803(3).

A panel of this Court noted in the prior PCRA appeal, "[t]he admissibility of statements such as those by Branaugh ... have been subject of considerable discussion in Pennsylvania jurisprudence." *Commonwealth v. Luster,* 986 A.2d 1259 (Pa.Super.2009) (unpublished memorandum at 13). Generally, our appellate courts have held that out of court statements by homicide victims are admissible when the statements are relevant for some other purpose, such as proof of motive or malice. *See Commonwealth v. Puksar,* 559 Pa. 358, 740 A.2d 219, 225 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000) (victim's statements that he did not trust defendant/brother and that he believed that defendant was trying to pass off replica model trains as originals were admissible to prove motive and ill will between brothers); *Commonwealth v. Chandler,* 554 Pa. 401, 721 A.2d 1040, 1045 (1998) (victim's statements concerning her "negative feelings about [defendant] and her relationship with him" admissible to prove malice and motive for killing); *Com-*

*monwealth v. Collins,* 550 Pa. 46, 703 A.2d 418, 425 (1997), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998) (victim's "statements evincing an intent to meet the defendant shortly before killing" and her concern that defendant would harm her if she "hindered his drug trade" were admissible to prove defendant's opportunity and motive); *Commonwealth v. Sneeringer,* 447 Pa.Super. 241, 668 A.2d 1167, 1171–1172 (1995), *appeal denied,* 545 Pa. 651, 680 A.2d 1161 (1996) (victim's statement concerning her intention to end her relationship with defendant relevant to motive for killing).

Branaugh testified regarding his 10:30 p.m. encounter with Karcher as follows:

Q [Prosecution]: Did you have any contact, face-to-face contact with Christine that night?

A: Yes, I did. That is when I seen her, I talked to her.

Q: Can you describe, first of all, what was her demeanor, how was she?

A: She sounded like she had been drinking. She was nervous and scared.

Q: And did she say anything to you about why she was scared?

A: Yes. That her and Aaron had an argument that night and he was going to do something real bad to her and she was, like, really scared.

Q: And did she ask you for anything?

A: Yes. She asked me if I would hang out with her to make sure nothing happens to her and asked me to have a drink with her, just to keep her company.

N.T. Trial, 3/15/04, at 100–101.

The statement at issue here does not provide proof of motive or malice on the part of Luster. Indeed, Karcher's statement that she was scared that Luster "was going to do something real bad to her" concerned her own state of mind and her

fear of Luster, and it is well-settled that hearsay evidence concerning the victim's state of mind is admissible only if the victim's state of mind is a "factor in issue" at trial. *Commonwealth v. Laich,* 566 Pa. 19, 777 A.2d 1057, 1061 (2001). Here, Karcher's statement is more akin to the victims' statements in *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248 (1981), *Laich, supra,* and *Commonwealth v. Levanduski,* 907 A.2d 3 (Pa.Super.2006) (*en banc*).

In *Thornton, supra,* the Commonwealth introduced a statement by the homicide victim that he carried a gun for protection because the defendant and his brothers "were after him." *Thornton,* 431 A.2d at 251. On appeal, the Pennsylvania Supreme Court held that the statement was erroneously admitted because "the victim's state of mind was not a matter in issue in the case." The Supreme Court explained:

> Only when the declaration is considered for the truth of the matter asserted, that appellant and his brother were after the victim, does the declaration become relevant, that is, both material to and probative of *appellant's intent* to kill. However, when considered for its substantive truth, the declaration, although relevant, is incompetent and hence inadmissible because it is hearsay not within any exception.

*Id.* (emphasis supplied).[9]

In *Laich, supra,* the Supreme Court once again considered the admissibility of a statement by a homicide victim. In that case, one week before her death, the defendant's girlfriend told the witness that the defendant had warned her that "if he

ever caught her with another man, that he would kill them both." *Laich,* 777 A.2d at 1060. One week later, the defendant fatally shot his girlfriend and a man after he found them naked in his apartment. The Court again held that the victim's statement, which foreshadowed her death, constituted inadmissible hearsay. The Court explained:

> Here, as in *Thornton,* what [the appellant's girlfriend] believed about the state of her relationship with Appellant was completely irrelevant to Appellant's degree of guilt. Appellant admitted killing [the victims], but argued that he had only done so with provocation. In light of Appellant's defense, it was *Appellant's* state of mind at the time of the killings that was relevant as to whether he committed the crimes with premeditation or whether, as he claims, he was acting with a "sudden and intense passion resulting from serious provocation." Contrary to what the lower courts concluded, [the victim's] state of mind regarding her relationship with Appellant was simply not relevant given Appellant's defense.

*Laich,* 777 A.2d at 1062 (emphasis in original and footnotes omitted).[10]

Finally, in *Levanduski, supra,* an *en banc* panel of this Court considered whether the trial court had properly admitted into evidence a letter written by the victim in which he relayed his suspicions that his wife (the appellant) and her paramour might try to kill him. The panel concluded that the letter constituted inadmissible hearsay, and did not meet the state of mind exception to the hearsay rule:

---

9. The *Thornton* court ultimately held, however, that the error was harmless in light of the overwhelming evidence of the appellant's guilty and the lack of support for the appellant's defenses of self-defense and provocation. *Thornton,* 431 A.2d at 252.

10. The *Laich* Court considered, but ultimately rejected, the Commonwealth's claim that the admission of the victim's statement was harmless error. *Commonwealth v. Laich,* 566 Pa. 19, 777 A.2d 1057, 1061 (2001).

Under the common application of this hearsay exception, [the victim's] letter could be used to establish his own state of mind, but not Appellant's state of mind. [The victim's] state of mind was not a matter at issue in this case. Only when [the victim's] letter is considered for the truth of the matter asserted, does it become relevant, that is material to and probative of Appellant's intent or motive to kill [the victim]. However, when considered for its substantive truth, although relevant, the letter is incompetent and therefore inadmissible.

*Levanduski*, 907 A.2d at 18 (citation omitted).

Here, the statement at issue, *i.e.*, that Luster was "going to do something real bad to her," was relevant only to Karcher's state of mind and her fear of Luster. However, Karcher's state of mind was not a "factor at issue" in this case. *See Laich, supra.* The statement, considered alone, did not provide proof of motive or malice. Indeed, unless it is considered for its truth, the statement was irrelevant to Luster's defenses that (1) his actions did not cause Karcher's death, and (2) that he did not act with malice. *See id.* In light of the foregoing I cannot agree that Karcher's statement to Branaugh that she was afraid he was going to do something "real bad" to her represents a valid state of mind exception.

Nevertheless, while I believe counsel should have objected to the introduction of this testimony, I cannot conclude the failure caused Luster prejudice. Substantially similar evidence was validly admitted regarding the second phone call. Because the improperly admitted evidence is merely cumulative to other properly admitted evidence, I cannot find the harm needed for a finding of ineffective assistance of counsel.

In conclusion, as discussed above, I believe Luster has proven two claims of ineffective assistance of counsel. Trial counsel failed to challenge critical evidence from Branaugh and appellate counsel failed to raise an arguably valid challenge to other critical evidence from Luster's wife. This unchallenged evidence provided vital support to the Commonwealth's case. The remaining evidence was not overwhelming. In my view, these omissions of counsel prejudiced Luster's case, and compel reversal of the order of the PCRA court and a new trial.

Therefore, I must respectfully dissent.