J-S32014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL WILLIAMS, | |
| Appellant | No. 2836 EDA 2015 |

Appeal from the PCRA Order August 10, 2015
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0001102-2013

BEFORE:  BOWES, MUNDY AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 21, 2016**

Michael Williams appeals from the August 10, 2015 order denying him PCRA relief.  We affirm.

On January 16, 2013, East Police Department Inspector Salvatore Crisafulli was investigating the manufacture of methamphetamine at 1415 Pine Street, Easton.  At 4:00 a.m., he conducted a trash pull, and police confiscated two trash bags from trash cans located on the curb in front of that location.  Since an intense chemical odor and a white gas was emanating from the bags, the Pennsylvania Police State Clandestine Response Team (the "Team") was contacted to process the items and control exposure to hazardous chemicals.  The following items were found in the trash bags in question: 1) broken batteries, including lithium strips and

* Retired Senior Judge assigned to the Superior Court.

battery hulls; 2) a brown liquid in a bottle labeled as waste; 3) a melted bottle containing a white solid substance; 4) starting fluid; 5) ammonia and PH test kits; 6) empty packages of pseudoephedrine-based medicine; 7) ice packs containing ammonia nitrate; 8) a broken pipe used to consume methamphetamine; and 9) several articles of mail addressed to Appellant at the 1415 Pine Street address. The Team concluded that these items included components and chemicals needed to manufacture methamphetamine.

Inspector Crisafulli completed an affidavit of probable cause to search 1415 Pine Street, and a warrant was issued on January 17, 2013. It was executed the same day, and the following items were recovered at that location: 1) packs of cold compresses that had been sliced open; 2) a can of starting fluid; 3) a box of baking soda; 4) two containers of salt; 5) a small glass dish and aluminum foil; 6) an ammonia nitrate test kit; 7) isopropyl alcohol; 8) a full-mouth facemask respirator; and 9) a box containing pipes utilized to consume methamphetamine. Appellant was charged with operating a methamphetamine laboratory, possession of red phosphorus and other substances with the intent to manufacture a controlled substance, possession of drug paraphernalia, and possession of a controlled substance with intent to manufacture or deliver it.

At trial, the Commonwealth's witnesses included Inspector Crisafulli, and Rebecca Patrick, who was a laboratory technician with the Team.

Inspector Crisafulli introduced a print-out from Meth Check, an online database tracking the purchase of ephedrine and pseudoephedrine, which are used to manufacture methamphetamine. The Meth Check document indicated that Appellant's last purchase of a drug used to manufacture methamphetamine, which was pseudoephedrine, occurred on January 6, 2013. As of that date, Appellant was legally prevented from purchasing any more of that substance for thirty days.

Exhibits included a videotaped statement Appellant gave to police and letters that he wrote to Inspector Crisafulli. In the statement, Appellant boasted about his knowledge of the local methamphetamine market and his experience in producing that substance. Appellant told police that the remnants of the methamphetamine laboratory discovered in the trash pull was not his work, even though letters addressed to him were located in the same trash bag, since the components indicated that the laboratory was amateurish and beneath his abilities. In his letters, Appellant delineated his extensive knowledge of cooking methamphetamine, volunteered to aid the police in investigating other methamphetamine laboratories, and examined the evidence obtained in the present case.

Ms. Patrick was qualified as an expert witness in drug analysis and the clean-up of of hazardous materials from methamphetamine laboratories. She authored two laboratory reports. In the first one, Ms. Patrick focused on evidence obtained through the trash pull and reviewed the one-pot method

of methamphetamine cooking, which she stated was commonly used in Pennsylvania. Ms. Patrick concluded that the trash pull indicated that there had been an unsuccessful attempt to manufacture methamphetamine. Ms. Patrick also testified about the empty packets of cold medicine found in the trash and indicated that they contained 8.2 grams of pseudoephedrine, which could be used to produce the same amount of methamphetamine. Ms. Patrick also stated that she tested the liquid in the bottle marked as waste and discovered during the trash pull. The liquid was positive for the presence of methamphetamine crystals and contained other by-products from producing that drug. Ms. Patrick's second report examined the items seized pursuant to the search warrant. Ms. Patrick discussed the inventory list and explained how some of the items seized could be used to manufacture methamphetamine and were consistent with the one-pot method.

A jury convicted Appellant of all the offenses. After receiving a sentence of six and one-quarter to twenty-one years imprisonment, Appellant filed a direct appeal. We rejected his argument that his convictions were not supported by sufficient evidence and were against the weight of the evidence, but remanded for resentencing since Appellant had received a mandatory minimum sentence in violation of *Alleyne v. United States*, 133 S. Ct. 2151 (2013). *Commonwealth v. Williams*, 116 A.3d

689 (Pa.Super. 2014) (unpublished memorandum). On March 6, 2015, Appellant was re-sentenced and received the same term of imprisonment.

On April 9, 2015, Appellant filed a timely *pro se* PCRA petition, counsel was appointed, and the court conducted a hearing. This appeal followed the denial of relief. Appellant presents these issues for our review:

1. Whether trial counsel was ineffective for failing to file a suppression motion challenging the validity of a search warrant?

2. Whether trial counsel was ineffective for failing to challenge the scientific evidence?

3. Whether trial counsel was ineffective for failing to object to remarks made in the closing argument by the Commonwealth?

4. Whether trial counsel was ineffective in failing to call Dawn Stocker as a witness.

Appellant's brief at 3.

Initially, we outline our standard of review of a PCRA order.

Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Marshall*, 596 Pa. 587, 947 A.2d 714, 719 (2008). The PCRA court's credibility determinations, when supported by the record, are binding on this Court. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532, 539 (2009). However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 810 (2007).

*Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011). *Accord Commonwealth v. Bardo*, 105 A.3d 678, 685 (Pa. 2014) ("If supported by the record, the PCRA court's credibility determinations and factual findings

are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.").

Appellant averments all relate to his insistence that he received ineffective assistance from trial counsel. In this respect, we observe:

> Counsel is presumed effective, and in order to overcome that presumption a PCRA petitioner must plead and prove that: (1) the legal claim underlying the ineffectiveness claim has arguable merit; (2) counsel's action or inaction lacked any reasonable basis designed to effectuate petitioner's interest; and (3) counsel's action or inaction resulted in prejudice to petitioner. With regard to reasonable basis, the PCRA court does not question whether there were other more logical courses of action which counsel could have pursued; rather, the court must examine whether counsel's decisions had any reasonable basis. . . . To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different. Failure to establish any prong of [this test, which is known as the] ***Strickland/Pierce*** test will defeat an ineffectiveness claim.

***Commonwealth v. Mason***, 130 A.3d 601, 618 (Pa. 2015) (citations, quotation marks and footnote omitted).

After careful consideration of Appellant's averments of ineffectiveness, we conclude that they are wholly without merit. We affirm on the thorough and well-reasoned August 10, 2015 opinion of the Honorable Stephen G. Baratta.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2016

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
:     No. CP-48-CR-0001102-2013
:
v. :
:
MICHAEL WILLIAMS, :
:
Defendant :

## OPINION AND ORDER OF COURT

Before the Court for disposition is Defendant's, Michael Williams, petition for relief filed pursuant to the Post-Conviction Relief Act (PCRA), 42 PA.CONS.STAT.ANN. §§ 9541-9546.

### I.   Factual Background and Procedural History

On January 16, 2013, Inspector Salvatore Crisafulli, of the Easton Police Department was participating in an investigation related to the manufacture of controlled substances from a residence identified as 1415 Pine Street in the City of Easton, Northampton County, Pennsylvania. At approximately 4:00 a.m., Inspector Crisafulli conducted a "trash pull", in which the police took two bags of trash from three curbside trashcans in front of 1415 Pine Street. The trash bags were transported to the Easton Police Department for examination. Inspector Crisafulli testified that there was a strong, intense chemical odor coming from the bags, along with a white gas.

The Pennsylvania State Clandestine Response Team was contacted to aid in processing the items and to limit the hazardous exposure of the officers. The items recovered from the trash pull included (1) broken batteries, including lithium strips and battery hulls; (2) a brownish liquid in a Pepsi bottle marked as "waste"; (3) a melted bottle with a white solid gassing substance; (4) starting fluid; (5) an ammonia test kit and

PH test kit; (6) empty blister packs of pseudoephedrine-based medicine; (7) ice packs, which contain ammonia nitrate in small round balls; and (8) a broken meth pipe. The Clan Lab Team confirmed that a clandestine methamphetamine lab was recovered as well as the ingredients used to manufacture methamphetamine. Additionally, the officers recovered from the trash bags several articles of mail and paperwork addressed to Michael Williams with the address of 1415 Pine Street.

Inspector Crisafulli presented an application for a search warrant and affidavit of probable cause on January 17, 2013. The search warrant for 1415 Pine Street was signed by the issuing authority, Elizabeth A. Romig, Senior Magisterial District Judge.

The search warrant was executed on January 17, 2013 and the officers seized (1) packs of cold compresses, which were cut open; (2) a can of Prestone Starting Fluid, unopened; (3) a box of baking soda; (4) two containers of salt; (5) a small glass dish and aluminum foil; (6) an ammonia nitrate test kit; (7) isopropyl alcohol; (8) a full-mouth facemask respirator; and (9) a box containing meth pipes. Williams was subsequently charged with operating a methamphetamine laboratory; possession of red phosphorus, etc. with intent to manufacture a controlled substance; use of, or possession with intent to use, drug paraphernalia; and manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance. [1] A jury trial was held from July 8 through July 10, 2013.

Following a jury trial, Williams was found guilty of all charges. In so doing, the jury also concluded that Williams had manufactured between 5 and 10 grams of methamphetamine. Subsequent thereto, this Court sentenced Williams on September 6,

---

[1] 35 P.S. §§ 780-113.4(a)(1), 780-113.1(a)(3), 780-113(a)(32), 780-113(a)(3), respectively.

2

2013 to an aggregate period of 6 ¼ to 21 years' incarceration. On September 6, 2013, Williams filed post-sentence motions *pro se*. On September 9, 2013, defense counsel was discharged, as Williams raised complaints of ineffectiveness of counsel, and conflict counsel, Brian Monahan, Esquire, was appointed to represent Williams regarding post-sentence matters.

On September 16, 2013, Williams filed a *pro se* notice of appeal to the Superior Court of Pennsylvania. Consequently, this Court found that Williams' notice divested us of jurisdiction and entered an order denying said motions pursuant to Pa.R.A.P. 1701(a) on September 24, 2013. On or about December 6, 2013, the Superior Court remanded the matter back to this Court for the filing of counseled post-sentence motions *nunc pro tunc*. On March 13, 2014, Williams filed post-sentence motions, which this Court denied on April 15, 2014. Williams then filed a timely appeal to the Superior Court raising challenges to the sufficiency and weight of the evidence and both the discretionary aspects of his sentence and the legality of this sentence in light of *Alleyne v. United States*, 133 S.Ct. 2151 (2013). On December 16, 2014, the Superior Court affirmed Williams' convictions; however vacated Williams' sentence and remanded the matter to this Court for resentencing without consideration of the mandatory minimum sentences provided in 18 PA.CONS.STAT.ANN. § 7508(a)(4)(i). On March 6, 2015, this Court resentenced Williams. Williams filed the instant *pro se* PCRA petition on April 9, 2015. Brian Monahan, Esquire, was appointed to continue representing Williams in these PCRA proceedings. This Court held a hearing on Williams' PCRA petition on June 11, 2015.

3

## II. PCRA Standard of Review

When reviewing an order dismissing a PCRA petition, the Superior Court must determine whether the ruling of the PCRA court is supported by record evidence and is free of legal error. *Commonwealth v. Burkett*, 5 A.3d 1260, 1267 (Pa. Super. 2010). "Great deference is granted to the findings of the PCRA court, and these findings will not be disturbed unless they have no support in the certified record." *Commonwealth v. Carter*, 21 A.3d 680, 682 (Pa. Super. 2011) (citation omitted).

## III. Discussion

### *Ineffective of Counsel – General Standard*

The law presumes counsel has rendered effective assistance. *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Williams, supra.*

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness if of arguable merit..." *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa. Super. 2004).

4

Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

*Pierce, supra* at 524, 645 A.2d at 194-195 (internal citations omitted).

Prejudice is established when [a defendant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In [*Kimball, supra*], we held that a "criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Commonwealth v. Chambers,* 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002) (some internal citations and quotation marks omitted).

### Ineffectiveness of Counsel – Failure to File a Motion to Suppression

In his first issue, Williams avers that trial counsel was ineffective in failing to challenge the validity of the search warrant by filing an omnibus pre-trial motion to suppress. Williams submits that raising a Fourth Amendment claim "would have resulted in the exclusion of evidence that was unconstitutionally seized from an illegal search on January 17, 2013" where the "police executed a force entry without a search warrant or any official document authorizing them do so." *See Pro Se* Brief in Support of Post-Conviction Relief Act, 5/4/15, at 2-3. Further, Williams avows that the "affidavit itself failed to establish probable cause to issue the warrant" and thus, trial counsel should have filed a motion to suppress. The crux of Williams' argument at the time of the PCRA hearing and, in his repeatedly *pro se* filings to this Court is that, counsel failed to provide him with a copy of the signed search warrant and that in his words "[the

5

police] entered [his] house with no paperwork at all" and as such "the search was not legal." *See* N.T., PCRA Hearing, 6/11/15, at 14.

Where the ineffectiveness claim is based on the failure of counsel to move for suppression of evidence, "the defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable." *Commonwealth v. Arch*, 654 A.2d 1141, 1143 (Pa. Super. 1995) (citation omitted). Thus, we must first determine if there is merit to the claim that the evidence seized from Williams' residence should have been suppressed due to the lack of a search warrant or that the affidavit lacked probable cause to issue.

Article I, Section 8 of the Pennsylvania Constitution provides as follows:

> The people shall be secure in their persons, houses, papers and possession from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

The protection provided by Article I, Section 8 "extends to areas where an individual has a reasonable expectation of privacy." *Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295, 299 (2001). Pursuant to the so-called exclusionary rule, "[e]vidence discovered as a result of a search that violates the fundamental constitutional guarantees of Article I, Section 8 will be suppressed." *Commonwealth v. Gordon*, 546 Pa. 65, 683 A.2d 253, 256 (1996). Thus, it is important to distinguish between a violation of the fundamental constitutional guarantees of Article I, Section 8 and the mere technical noncompliance with the Pennsylvania Rules of Criminal Procedure. The Supreme Court of Pennsylvania has in fact, specifically "reject[ed] the automatic

6

application of the exclusionary rule to suppress evidence seized pursuant to a search which in some way violates the Pennsylvania Rules of Criminal Procedure relating to the issuance and execution of search warrants." *Commonwealth v. Gerald Mason*, 507 Pa. 396, 490 A.2d 421, 423 (1985). Indeed, it is only when violations of the Rules "assume constitutional dimensions and/or substantially prejudice the accused" that suppression may be necessary. *Id.* at 425.

In order to insure the protections provided under the Fourth Amendment to the United States Constitution and Article I, Section 8 of our Pennsylvania Constitution against unreasonable searches and seizures, both the Pennsylvania Supreme Court and the United States Supreme Court require law enforcement officers to obtain a judicially-issued search warrant, absent certain exigent circumstances. *Commonwealth v. Chandler*, 505 Pa. 113, 122, 477 A.2d 851, 855 (1984). A prior independent judicial determination of probable cause is essential:

> It is not enough, absent exigent circumstances, that a policeman believe the facts he has are probable cause for a search warrant. The people of this state and nation are constitutionally entitled to an independent judicial determination of probable cause before they must open to the policeman's knock at the door in the night. Moreover, that determination must be made before and not after the search. The written affidavit of probable cause simply insures an accurate record of the verified (sworn) facts the issuing authority had when he made his determination before the event.
> ***
> Reasonable judges and legal scholars may well differ over the technicalities of how best to memorialize the facts the issuer of the warrant had when he issued it and how technical courts should be in reviewing his decision to issue. We believe, however, none ever doubted the necessity of the exercise of judicial discretion.

*Id.* (citations omitted).

At the time of the PCRA hearing, Williams argued that he instructed trial counsel to file a motion to suppress; however, counsel "didn't do anything." *See* N.T., PCRA

7

Hearing, 6/11/15, at 12. To the contrary, Attorney Shipman testified that he did not recall Williams asking him to do that but "he may have." *Id.* at 44. According to counsel "if [Williams] did, [he] would have told him that [he] would not have filed it because the warrant appeared to comply." *Id.* More importantly, "if the warrant had any irregularities that [he] observed" Attorney Shipman "would have filed a motion to address that." *Id.*

Attorney Shipman's trial strategy is sound in this regard. Senior Magisterial District Judge Elizabeth Romig swore the oath of Inspector Crisafulli on January 17, 2013 and, concluded that probable cause existed for the issuance of the warrant. Contrary to Williams repeated proclamation otherwise, the jurat[2] as well the signature of the issuing authority is affixed to the warrant. Further, our review of the "Application for Search Warrant and Authorization" time-stamped and filed with this Court on January 28, 2013 indicates that all of the other procedural mandates with respect to the issuance of a search warrant have been fully complied with. Specifically, in the "Search Warrant" section of the warrant, Sr. Magisterial District Judge Romig marked an "x" next to the line indicating a daytime warrant and wrote "1:30 PM o'clock January 19, 2013" indicating the last date on which the warrant could be executed. She checked the box under "Signature of Issuing Authority" indicating her title as "Senior Magisterial District Judge" and wrote in the date on which her commission expires, "Sr.M.D.J.". Even though Williams insists otherwise, the search warrant was not sealed.

Attorney Shipman readily admitted that "initially in discovery [he] received a search warrant" which "was not completed"; however, as he recalls "somewhere near

---

[2] The jurat is the certificate signed by the judicial officer stating that the affidavit of probable cause was sworn to and subscribed by the affiant before her. *See Commonwealth v. Vaughn*, 789 A.2d 261, n.1 (Pa. Super. 2001).

8

trial, maybe even the first day" he was provided with "a copy of the signed warrant" which was filed with this Court. *Id.* at 43. Attorney Shipman testified that he provided Williams with a copy of the warrant. *Id.* The search warrant was valid and properly executed. Williams invokes no other constitutional violations with respect to the warrant other than a procedural one. As such, counsel cannot be deemed ineffective in failing to pursue a baseless suppression motion.

### *Ineffectiveness of Counsel – Failure to Challenge the Scientific Evidence*

Next, Williams argues that counsel was ineffective in failing to hire an expert to test the results in order to challenge the scientific evidence presented by Commonwealth witness, Rebecca Patrick. Alternatively, Williams avers that counsel was ineffective in failing to request additional discovery related to the tests conducted by the state police laboratory technician. *See* N.T., PCRA Hearing, 6/11/15, at 24.

At the time of trial, the Commonwealth presented PSP forensic scientist Rebecca Patrick as an expert witness in the field of drug analysis and the hazmat clean-up of meth labs. In her testimony, the Commonwealth introduced into evidence two laboratory reports. The first lab report focused on evidence obtained through the "trash pull" and gave an overview of the one-pot method of meth cooking that is commonly used in Pennsylvania. Ms. Patrick concluded that the clandestine manufacturing of methamphetamine was attempted, but unsuccessful, citing the ignited plastic bottle, which she referred to as the "cooking vessel", as evidence that something went wrong in the manufacturing process. Ms. Patrick testified that no methamphetamine was found because it appeared that the cooking process had failed.

9

Ms. Patrick also testified about the two blister packs of cold medicine. Ms. Patrick testified that each blister pack holds 3.6 grams of pseudoephedrine and can be used to generate a one-to-one ratio of methamphetamine – 3.6 grams of pseudoephedrine can produce 3.6 grams of methamphetamine.

The second lab report focused on the items seized from Williams' bedroom when the police officers executed the search warrant. Ms. Patrick went through the inventory list and explained how some of the items seized could be used to manufacture methamphetamine. Ms. Patrick concluded that many of the items found were consistent with the one-pot method commonly used in Pennsylvania. During her testimony Ms. Patrick was presented with a Pepsi bottle, which was filled with what appeared to be a brownish liquid. The bottle was marked "waste," apparently labeled prior to its seizure by law enforcement. Ms. Patrick testified that she removed and weighed just the liquid. Then she tested the liquid for the presence of methamphetamine and identified the presence of methamphetamine crystals in the liquid.

On direct and cross-examination, Ms. Patrick acknowledge that the liquid solution was not entirely methamphetamine. It also contained the by-products from the manufacture of methamphetamine. Ms. Patrick testified that one knowledgeable about the manufacturing process can store the water from the manufacturing process to later distill the solution to retrieve the methamphetamine that is dissolved within. Further, Ms. Patrick acknowledged that it is possible that the solution may also have contained urine, as knowledgeable users can recycle urine to reclaim any methamphetamine that was not processed by the body. However, Ms. Patrick did not test the solution for the presence of urine. Further, Ms. Patrick did not reduce the liquid solution to measure the

10

weight of only the methamphetamine. The lab report indicated that the entire solution weighed 1,340 grams.

In his PCRA, Williams avers that, Ms. Patrick is "not certified to do analogical chemical analysis on gas chromatography testing" because the "Bethlehem Regional Laboratory is not equipped to do those kinds of tests." *See* N.T., PCRA Hearing. 6/11/15, at 15-16. Williams, a self-proclaimed expert meth cooker stated that Ms. Patrick's conclusions were based on pure speculation and conjecture because, "you cannot know the contents of bottle by doing a Ph test and a color test." *Id.* at 20. It is Williams' opinion that without a "fluid analysis work-up" it was impossible to put on tests for contents of the bottle." *Id.* at 16, 20. As such, Williams argues that Ms. Patrick's report was what he coins "a dry lab report" meaning "a report without the test certificate attached to it." *Id.* Williams avows that trial counsel was ineffective in failing to challenge the scientific evidence presented by Ms. Patrick by calling its own expert or alternatively, requiring the Commonwealth to produce additional discovery, *i.e.*, a copy of the test results. We disagree.

Admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605 (2001). Moreover, the standard for qualifying an expert witness is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible. *Commonwealth v. Riffert*, 549 A.2d 566 (1988). The witness's expertise may be based on practical, occupational, or other experiential training; it need not have been gained through academic training alone. *Id.* Expertise can most certainly be acquired though

11

occupational experience as well as by scientific study." *Commonwealth v. Spotz*, 756 A.2d 1139, 1160 (Pa. 2000), *cert. denied*, 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (citations omitted).

As this Court aptly noted, Ms. Patrick "gave her opinion based on her observation, based on her work in the lab and a whole bunch of things related to [Williams] cooking process". *Id.* The jury, sitting as the finder-of-fact was free to weigh the evidence and Ms. Patrick's credibility in rendering its verdict. Whatever counsel's reasoning or strategy behind not calling an expert witness of his own cannot be deemed ineffectiveness of counsel just because it was not the winning defense.

Trial counsel testified that he had the opportunity to examine the lab report prepared by Ms. Patrick and nothing "in that lab report raised suspicion or caused [him] to believe there was an issue with it." *See* N.T., PCRA Hearing, 6/11/15 at 46. If there "had been something that alerted [him]" he would have investigated further. *Id.* According to Attorney Shipman:

> It appeared to [him] to be on its face, like every other lab report that [he] [has] seen in here, it just indicated... there was nothing about it that would have indicated that this was based on a falsehood, not on science, but simply a lie.

*Id.* at 47. In addition, counsel tenaciously cross-examined the expert Ms. Patrick whom had the lab reports in hand and testified as to what tests she performed in the lab. *Id.* at 23. By Williams own admission, counsel "did bring out some points at trial" and "did a good job" of "proving it was not lab waste." *Id.* at 34. Accordingly, this claim too lacks merit.

12

<u>*Ineffectiveness of Trial Counsel – Failure to Object*</u>

Williams next asserts that during the Commonwealth's closing argument, the prosecutor made improper remarks "concerning the ingredients to the jury." *See* N.T., PCRA Hearing, 6/11/15 at 27. Specifically, Williams avers that "[the prosecutor] told the jury that baking soda can be used as a substitute for drain cleaner" and that "police found red phosphorus, which they did not." *Id.* Williams, a self-proclaimed quality meth cooker, testified that "there [are] seven ingredients that she claims to manufacture methamphetamine; red phosphorous is not one." *Id.* at 27, 38-39. Further, Williams avers that "baking soda is not used in place of drain cleaner to manufacture meth in the United States or around the world. You can ask any criminal you want." *Id.* at 28. It is Williams' position that those comments by the prosecutor were improper remarks made to the jury and as such, trial counsel was ineffective in failing to object to the prosecutor's closing argument. We disagree.

In considering a prosecutorial misconduct claim, "our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one." *Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa. Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments...were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made. Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury.

13

*Id.* "[A] new trial is required only when a prosecutor's improper remarks are prejudicial, *i.e.*, when they are of such a nature or delivered in such a manner that they may reasonably be said to have deprived the defendant of a fair and impartial trial." *Commonwealth v. Davis, J.*, 554 A.2d 104, 111 (Pa. Super. 1989), *appeal denied*, 524 Pa. 617 571 A.2d 380 (1989).

Instantly, the prosecutor made the following comments during closing arguments:

> Now, we also have the ingredients, the precursors. We have the main ingredient, the ingredient you must have, the pseudoephedrine. (indicating). The hot item. We have the sodium chloride, which is the salt, (indicating), we have the lithium, (indicating) the batteries, (indicating, we have the ammonium nitrate, (indicating), the cut cold packs, (indicating), *we have the sodium bicarbonate, (indicating), which she testified you can use baking soda, it's a weaker substitute for the drain crystals, but still works. She found it to be significant.* The alcohol, (indicating), to help break down the pseudoephedrine. *There was also red phosphorus from matches, you saw the picture, but you had to get the story.* What else? We have the byproducts of the manufacturing process, the waste. She testified how when you manufacture methamphetamine, you take a coffee filter, you pour the product into a funnel into the coffee filter to drain out the waste product and you're left with the smokable, ingestible, usable meth crystals. So we have the waste product right here. (indicating)
>
> . . .
>
> Now, let's talk about that a little further. Let's talk about some of the things that he did admit to processing. First *in the garbage we have these recipes or these ingredients used to make meth, the baking soda, the sodium bicarbonate is in here*, the ammonia, the battery acid, hydrochloric acid, the ether, not short of trying to make meth with the red phosphorus, the strike pad.

*See* N.T., Jury Trial, Volume III, 7/10/13, at 15-17 (emphasis added).

"A prosecutor has great discretion during closing argument. Indeed, a closing 'argument' is just that: argument." *Commonwealth v. Brown*, 911 A.2d 576, 580 (Pa. Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007). "It is well settled that

14

the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom..." *Commonwealth v. Hogentogler*, 53 A.3d 866, 878 (Pa. Super. 2012), *appeal denied*, 620 Pa. 720, 69 A.3d 600 (2013) (quotation omitted). Here, the prosecutor was merely commenting on the evidence presented by the Commonwealth's witnesses. The comments were clearly derived from the evidence and testimony adduced at trial or from proper inferences drawn therefrom and thus, were entirely permissible. As such, trial counsel cannot be deemed ineffective in failing to object to the prosecutor's remarks.

### Ineffectiveness of Trial Counsel – Failure to Call a Witness

Williams next avers that counsel was ineffective in failing to call his sister, Dawn Stocker as a witness at the time of trial. To succeed on a claim of counsel's ineffectiveness for failure to call a witness a petitioner must prove that "the witness [ ] existed, the witness [was] ready and willing to testify, and the absence of the witness['] testimony prejudiced petitioner and denied him a fair trial." *Commonwealth v. Luster*, 71 A.3d 1029, 1047 (Pa. Super. 2013) (en banc) (citations omitted).

According to Williams, Dawn Stocker was ready and willing to testify on his behalf. In support of his claim, Williams attached an affidavit from Dawn Stocker which provided as follows:

> Mike L. Williams did not live at 120 A. 15th Street. I Dawn Stocker rent the apt. at the time I was in a work-release program, the apt. was raided, the police were not there for Mike Williams they came in looking for a guy my daughter was dating who was also selling heroin.

*See* Unsworn Declaration to Authorities, Dawn M. Stocker, 3/2/15. At the time of the PCRA hearing, Williams stated "this cop lied on the witness stand about [his]

15

involvement" because he had "a statement from Dawn Stocker saying that she was the one that was renting" the property. *See* N.T., PCRA Hearing, 6/11/15, at 28, 30. Williams avers that counsel was ineffective in failing to call Dawn Stocker to testify that "she was the renter of the house when the place was raided on January 11th" to rebut Inspector Crisafulli's testimony that the police "came in looking for [him]" and, "they didn't" because according to Williams "they went in for Denny Inokay, Dawn Stocker and another guy in there." *Id.* at 29. Williams insisted that he "was not a target for that house." *Id.* at 32.

While it is apparent that the witness existed and was willing to testify at trial Attorney Shipman testified that he remembers "speaking with [Dawn Stocker]" and ultimately "decided not to call her as a witness" "because of credibility issues relate to her prior record." *Id.* at 45. Williams is however unable to show how the absence of Dawn Stocker's testimony prejudiced him. As this Court pointed out at the PCRA hearing, how is it "relevant that the police went to *another* house that they believed was involved in methamphetamine" and "they thought [Williams] would be in the house." *Id.* (emphasis added). That residence and its occupants may have been under investigation; however, the fact remains that, following a "trash pull" on January 16, 2013, *outside of Williams' residence*, 1415 Pine Street, evidence was uncovered and, the police obtained a search warrant. The search warrant was executed on January 17, 2013 and the officers seized (1) packs of cold compresses, which were cut open; (2) a can of Prestone Starting Fluid, unopened; (3) a box of baking soda; (4) two containers of salt; (5) a small glass dish and aluminum foil; (6) an ammonia nitrate test kit; (7) isopropyl alcohol; (8) a full-mouth facemask respirator; and (9) a box containing meth

16

pipes. Accordingly, counsel cannot be deemed ineffective in failing to call Dawn Stocker as a witness as her proffered testimony would have been irrelevant and, not have aided the defense.

BY THE COURT:

STEPHEN G. BARATTA, P.J.

17

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
: No. CP-48-CR-0001102-2013
:
v. :
:
MICHAEL WILLIAMS, :
:
Defendant :

## ORDER OF COURT

AND NOW, this __10th__ day of August, 2015, upon consideration of Defendant's, Michael Williams petition for relief filed pursuant to the Post-Conviction Relief Act (PCRA), 42 PA.CONS.STAT.ANN. §§ 9541-9546, said petition is hereby DENIED.

BY THE COURT:

STEPHEN G. BARATTA, P.J.