J-S37032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ELI ROSA | : | |
| | : | |
| Appellant | : | No. 1769 EDA 2022 |

Appeal from the Judgment of Sentence Entered December 8, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at CP-51-CR-0000244-2021

BEFORE:  BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED NOVEMBER 14, 2023**

Eli Rosa (Appellant) appeals *nunc pro tunc* from the judgment of sentence imposed following his conviction of attempted murder (serious bodily injury); aggravated assault (serious bodily injury); possession of a firearm prohibited; firearms not to be carried without a license; carrying a firearm on public streets in Philadelphia; and possession of an instrument of crime.[1]  We affirm.

As the trial court explained, this

> case stem[s] from the investigation, apprehension, and arrest, of Appellant, … for attempting to assassinate Michael Roberts [(Roberts or Mr. Roberts)] on August 8, 2020[,] by repeatedly shooting and striking him even as he had laid helplessly prone on the street within the 2800 block of North Marshall Street … [in] Philadelphia.

---

[1] *See* 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), 6105, 6106, 6108, 907.

….

> [Roberts] testified at trial that he had been exiting [a] grocery store near his home when his ex-girlfriend, Rosalie Sotomayor, or "Rosie," had … driven up to him and asked him to help her buy drugs. [Roberts] had previously broken off his relationship with [] Rosie. Mr. Roberts had been aware that she also had a romantic relationship with the Appellant … and that Appellant had reportedly fathered at least one of Rosie's two minor children.
>
> Mr. Roberts testified that after Rosie had called him and convinced him to take her to buy weed, she drove the Jeep further down the street and they purchased and smoked weed briefly before Rosie then asked him to purchase weed/PCP nearby. [Roberts] again agreed, and Rosie drove the Jeep[,] with [] Roberts as front passenger[,] to the 2800 block of North Marshall Street[,] where they parked and smoked one blunt. While parked[,] Mr. Roberts noticed a cold change of behavior of Rosie towards him as she furiously texted on her phone.

Trial Court Opinion, 1/19/23, at 2.

Roberts then saw Appellant, "whom he had immediately recognized as Rosie's boyfriend and father of one of her two children[.]" *Id.* Appellant, "with unique facial tattoos" and wearing a hoodie, walked towards the Jeep. *Id.* at 2-3. Appellant stared at Roberts, then "looked upward to the sky before calmly pulling out [a] gun and repeatedly firing at" Roberts. *Id.* at 3. The trial court stated,

> [Roberts] alighted from the Jeep down the street to attempt to escape to no avail.
>
> Appellant relentlessly pursued and fired five (5) bullets from a 9mm semi-automatic handgun. Three bullets pierced and severely injured [Roberts's] abdomen and back. Fortunately, the gun jammed, and the magazine broke in pieces and fell to the ground. [Appellant] in frustration then pistol whipped [Roberts] as he flailed on the ground. Before picking up the gun and broken magazine and running down the street, [Appellant] shouted, "I'm

going to down your bitch ass, pussy" and other muffled expletives as Mr. Roberts lay on the ground writing in pain and bleeding profusely.

*Id.*

Officers arrived at the scene and used their patrol vehicle to rush Roberts to the hospital.

As depicted in the responding officer's body camera video, the victim begged for the officers not to let him die and yelled repeatedly that [Appellant] shot him. He told the officers that [Appellant] had lived over by Reese Street [in Philadelphia,] and had tattoos on his face and had worn a blue hoody.

*Id.* The parties stipulated to Roberts's multiple injuries:

The stipulated and authenticated records from Temple University Hospital reflected that [] Roberts's significant injuries required surgeries to address the wounds to his left chest, left flank, right buttocks. In addition to surgeries, he had needed emergency heart massages, reinflation of [a] collapsed lung, removal of [his] spleen, appendix, and sections of his small intestines. Temple University Hospital medical records supported the reasonable conclusion that Mr. Roberts's multiple wounds had been nearly fatal.

*Id.*

At the shooting scene, officers had collected "[f]ive spent or fired cartridge casings emanating from a 9mm firearm, three live bullets and a broken off portion of the magazine." *Id.* Officers further retrieved surveillance video from the cameras of a nearby home:

The retrieved surveillance video from the home camera not only portrayed the shooting but also captured the audio of the gunshots. Although the videos corroborated the victim's testimony concerning the method of shooting and the similar body type of Appellant and his described hoody, the facial features of the shooter were not visible. The videos portrayed the victim

- 3 -

frantically trying to run away and stumbling and crawling on the ground after being continuously fired upon and then struck physically by the single pursuer. It was clearly observable that the gun had jammed and broken apart before the shooter ran away in the opposite direction. The repeated shots are audible along with the shooter's death threats as he stood over the prone and severely wounded victim in the street.

*Id.*

On August 9, 2020, while in the hospital, Roberts identified Appellant as his assailant from a photo array. *Id.* at 5. Roberts additionally told police

he had been receiving taunting and threatening type of messages and attempted audio calls from [Appellant] to [Roberts's] Facebook page and via his instant messaging. [Roberts] was frightened about retribution. [Roberts] forwarded to the investigators screen shots of all messages from his phone just hours after awakening in the hospital….

*Id.*

After Roberts identified Appellant, officers executed a search warrant at Appellant's last known address.

[Appellant] was not apprehended and arrested under the open arrest warrant until approximately two months later, on October 22, 2020 …. He repeatedly gave the false name of Miguel Ortiz until the officer stated that [Appellant] would be fingerprinted. The officer's body cam video depicted Appellant's attempts to evade identification.

*Id.*

Appellant was tried by a jury and convicted of the above charges. The trial court sentenced Appellant to an aggregate prison term of 30-60 years. Following reinstatement of his direct appeal rights through a timely Post

Conviction Relief Act[2] petition, Appellant filed the instant *nunc pro tunc* appeal.

Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1.     Did the trial court err, abuse its discretion, and/or make a mistake of law in allowing unauthenticated Facebook posts and messages into evidence?

2.     Did the trial court err, abuse its discretion, and/or make a mistake of law in making specific comments about a baby in the back seat of the Jeep, where the prejudice resulting therefrom could not be cured by a post-objection instruction?

3.     Did the trial court err, abuse its discretion, and/or make a mistake of law in denying defense counsel's motion for a mistrial after the Commonwealth spoke about a prison phone call?

Appellant's Brief at 6.

Appellant first argues that the trial court improperly admitted unauthenticated Facebook posts and messages at trial. *Id.* at 17.  The Facebook messages were "purportedly written by [Appellant] harassing the victim, Mr. Roberts."  *Id.*  Appellant asserts this evidence lacked the authentication required by Pennsylvania Rule of Evidence 901.  *Id.* at 20. Appellant claims, "the proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be."  *Id.*  According to Appellant,

the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the authority of the communication in question, such as testimony from the person who sent or received the communication, or

---

[2] 42 Pa.C.S.A. §§ 9541-9546.

contextual clues in the communication tending to reveal the identity of the sender.

Appellant's Brief at 21 (citation omitted). Appellant argues the trial court improperly admitted this evidence, where there was "no showing that the Facebook messages actually came from [Appellant]." *Id.* at 21-22.

We review Appellant's claim under the following standard:

[D]ecisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party….

*Commonwealth v. Talley*, 236 A.3d 42, 55 (Pa. Super. 2020).

Before examining the merits of Appellant's issue, we examine whether he preserved the issue for review. "[I]t is axiomatic that issues are preserved when objections are made timely to the error or offense." *Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008). "In order to preserve an issue for review, a party must make a timely, specific objection." *Commonwealth v. Duffy*, 832 A.2d 1132, 1136 (Pa. Super. 2003); *see also* Pa.R.E. 103(a)(1) (providing that claim of error in the admission or exclusion of evidence is preserved if "a party, on the record[,] … makes a timely objection[] … and … states the specific ground, unless it was apparent from the context"). If the appellant failed to preserve an issue by a specific objection, the issue is waived. *Commonwealth v. Stetler*, 95 A.3d 864, 869 (Pa. Super. 2013).

At trial, the Commonwealth introduced Facebook posts in which the victim, Roberts, was "tagged." N.T., 10/1/21, at 94-97. Roberts testified that he interpreted the posts as Appellant "kinda ridiculing me." *Id.* at 96. One post included the initials, "K.A.R.", which Roberts interpreted as meaning "[k]ill all rats." *Id.* at 97. Roberts identified Appellant's comment, "Ima [*sic*] RAT!!MIKEE WITHTHE YOLA" as indicating Roberts was a "snitch." *Id.* at 98. Roberts identified other comments purportedly posted by Appellant. *Id.* at 99-100. Roberts testified that prior to the shooting, Appellant had never messaged him on Facebook. *Id.*

Our review discloses that Appellant lodged no objection to the admission of any exhibits or testimony regarding the Facebook messages and posts. *See id.* at 94-103. Consequently, Appellant failed to preserve this issue for appellate review. *See Stetler*, 95 A.3d at 869; *see also* Pa.R.A.P. 302(a) (providing that an issue may not be raised for the first time on appeal). Because the claim is waived, Appellant's first issue merits no relief.

Appellant next challenges the trial court's "prejudicial statement" at trial. Appellant's Brief at 9 (capitalization omitted). Appellant asserts that Roberts testified there was a child car seat in the back seat of Rosie's vehicle at the time of the shooting. *Id.* at 10. Upon hearing this, the following dialogue ensued:

THE COURT: The baby was in the car?

[Roberts]: The car seat.

THE COURT: The baby was in the car seat at the time of the shooting?

[Roberts]: Mm-hmm.

[Defense counsel]: Did you tell the police that there was a baby in the car seat at the time of the shooting?

[Roberts]: I'm not sure.

[Defense counsel]: So when do you first see the baby in the car seat?

[Roberts]: When I get the weed I go to get back in the car and try to put my seat back. I notice I can't put it back all the way, so I'm like, What, you got laundry in here? I look back and I see a car seat. I'm like, holy shit, you had a baby, man. You mess with your baby pop now?

THE COURT: She had the baby in the car seat?

[Roberts]: The baby was in –

THE COURT: In the car seat. Was the baby sleeping?

[Roberts]: She said, that's my son.

THE COURT: **Oh my lord. Okay, go ahead**.

[Defense counsel]: Your Honor, may I have a sidebar?

THE COURT: **Sure. I just have to take a deep breath**.

Appellant's Brief at 10-11 (emphasis added) (quoting N.T., 10/1/22, at 133-35).

Appellant argues that the judge's comments, in open court, "were statements capable of inducing prejudice in the mind of the jurors and capable of influencing the outcome of the case." *Id.* at 12. Appellant asserts that the trial court thus deprived him of a fair trial. *Id.* at 13. According to Appellant,

the bell in this instance could not be "unrung" and the judge's curative instruction could not remove the prejudice that had been instilled in the jury by the court's comments.

*Id.* (capitalization modified). Appellant claims the court's prejudicial statement could not be cured solely by its cautionary instruction. *Id.* at 9.

Appellant appears to argue that the trial court erred by not declaring a mistrial *sua sponte*. *See id.* Pennsylvania Rule of Criminal Procedure 605(B) provides, "When an event prejudicial to the defendant occurs during trial **only the defendant** may move for a mistrial[.]" Pa.R.Crim.P. 605(B) (emphasis added). Further,

[a] trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. A motion for a mistrial is a matter addressed to the discretion of the court.

*Commonwealth v. Jones*, 668 A.2d 491, 502-03 (Pa. 1995) (citations omitted).

Our review of the record indicates that Appellant did not request a mistrial. At sidebar, defense counsel objected to the trial court's interjection. N.T., 10/1/22, at 136-37. The trial court agreed to issue a cautionary instruction: "All right. I'll say ignore my response." *Id.* at 137. Defense counsel responded, "Thank you." *Id.* Because Appellant accepted the trial court's proposed cautionary instruction, he cannot claim - for the first time on appeal - that a mistrial was required. *See Commonwealth v. Cornelius*, 180 A.3d 1256, 1262 (Pa. Super. 2018) ("Appellant failed to make a timely request for a mistrial, and this claim, accordingly, has been waived.")

- 9 -

(quoting ***Commonwealth v. McAndrews***, 430 A.2d 1165, 1167 (Pa. 1981));

***see also*** Pa.R.A.P. 302(a).

We recognize a trial judge has "discretion to declare a mistrial *sua sponte* upon the showing of manifest necessity[.]" ***Commonwealth v. Walker***, 954 A.2d 1249, 1254 (Pa. Super. 2008) (*en banc*) (citation omitted). In ***Walker***, the defendant raised a claim of double jeopardy based on his prior mistrial; this Court held that the mistrial was due to manifest necessity, and thus affirmed the trial court's denial of the defendant's motion to dismiss on double jeopardy grounds. ***Id.*** at 1254. Appellant cites no applicable authority to demonstrate that he was relieved of his duty to request a mistrial to preserve this issue. Consequently, Appellant's second issue merits no relief. ***See Cornelius***, 180 A.3d at 1262; Pa.R.A.P. 302(a).

Appellant lastly claims the trial court improperly denied his motion for a mistrial based on the prosecutor's reference to a "prison call" during closing arguments. Appellant's Brief at 14. Specifically, Appellant challenges the following portion of the prosecutor's closing argument:

> Now, besides Mr. Roberts identifying [Appellant] as the person who tried to kill him, we have [Appellant's] own admissions. **Let's start with the prison call** -- I'm sorry, let's start with the phone call.

***Id.*** at 9 (emphasis added) (quoting N.T., 10/5/21, at 25). Appellant compares the prosecutor's remark to instances where a defendant appears for trial in prison garb. ***Id.*** at 14-16. Appellant argues,

- 10 -

in the present situation, there was no need for the Commonwealth to reference [Appellant's] incarceration, and, in fact, the parties had agreed beforehand that there would be no reference to prison during trial. *See* [N.T.], October 1, 2022[,] at pp. 88-89. As a result, the reference to [Appellant's] incarceration deprived him of a fair trial as a matter of law.

*Id.* at 16.

"In reviewing a trial court's denial of a motion for a mistrial, our standard is abuse of discretion." *Commonwealth v. Bryant*, 67 A.3d 716, 728 (Pa. 2013). Our Supreme Court has endorsed a two-part test to review the propriety of a prosecutor's remarks: (1) whether the substance of the remarks relate to the elements of the crimes charges, the evidence presented, and constitute a fair and reasonable rebuttal to the defense's arguments; and (2) whether the unavoidable effect of the remarks was to prejudice the jury against the defendant. *Commonwealth v. Clancy*, 192 A.3d 44, 62-63 (Pa. 2018). This Court has explained:

A prosecutor is permitted to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence.

In considering a claim of prosecutorial misconduct, our inquiry is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one. Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect ... [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Further, the allegedly improper remarks must be viewed in the context of the closing argument as a whole.

*Commonwealth v. Luster*, 71 A.3d 1029, 1048 (Pa. Super. 2013) (*en banc*) (quotation marks and citations omitted).

Our review reveals that the prosecutor's closing argument spans almost 18 transcript pages. N.T., 10/5/21, at 20-38 (prosecutor detailing the evidence against Appellant as to each charge). Appellant challenges only two words of the prosecutor's closing argument: "prison call". *Id.* at 25. The prosecutor immediately corrected the improper reference, and continued with argument. *Id.* at 25-38. Under these circumstances, the trial court explained,

> Pennsylvania's appellate courts have sparingly barred retrial due to prosecutorial misconduct, and only for especially duplicitous behavior. An example of the extreme misconduct needed to bar retrial can be found in *Commonwealth v. Martorano*, 741 A.2d 1221, 1223 (Pa. 1999). In that case, our Supreme Court barred retrial because the Commonwealth engaged in severe prosecutorial misconduct by consistently referring to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and repeatedly insisting that there was fingerprint evidence linking appellees to the crime when the prosecutor knew for a fact that no such evidence existed. *See* … *Martorano*, 741 A.2d [at] 1223 ….
>
> Although not specified within the Statement of Errors, the single request of a mistrial that had been raised by defense counsel had occurred following the Commonwealth's closing argument. Contextually, during the closing argument, the prosecutor walked over to play the stipulated recording of [Appellant's] telephone call to Rosie wherein he had essentially admitted to shooting [Roberts] and had asked Rosie to abscond with video evidence. As she traversed to the computer, [the prosecutor] remarked that she was going to play the "prison call" and then immediately corrected her words and said, "phone call." No objection was raised by the defense at that time. (N.T. 10/05/2021, p. 25).

Following closing arguments[,] however[,] defense counsel asked for side-bar conference and argued that the prosecutor's single word remark had usurped his client's presumption of innocence. **This Court denied the mistrial because the comment had been obviously inadvertent and corrected and because it would have been at least contextually obvious to any reasonable listener of the recorded telephone call conversations that the calls had occurred just after [Appellant] had been arrested and detained and therefore when he had still been in custody. Thus, the innocuous comment had no bearing whatsoever upon Appellant's presumption of innocence.** (N.T. 10/051/2021, p. 39-42). Moreover, this [c]ourt offered to provide a curative instruction which the defense declined. Notably, the jury had also been reminded within the final instructions that counsels' arguments are not evidence and that they should not be treated as such.[3] In summary, no prejudice occurred to warrant the extreme remedy of mistrial as requested. Appellant had received a fair trial.

Trial Court Opinion, 1/19/23, at 23-25 (emphasis and footnote added).

_____

[3] The trial court instructed the jury:

[I]t's your recollection that controls here and yours alone. You're not bound by my memory or by the memory of either counsel in their arguments to you. Nor are you to conclude that any evidence, which I call to your attention or which counsel has called to your attention, is the only evidence you should consider here. It is your responsibility to consider all the evidence that you believe to be material in deliberating upon your verdicts.

Similarly, remember back in the beginning I told you, you know, if I ask a question, **if counsel asks a question, our questions are not evidence**. The answers to those questions provide the evidence for you to consider….

N.T., 10/5/21, at 46 (emphasis added). "A jury is presumed to follow instructions the trial court provides[.]" *Commonwealth v. Johnson*, 289 A.3d 959, 1009 (Pa. 2023).

As the record and law support the trial court's analysis, we discern no abuse of discretion. The prosecutor's single, isolated reference to a "prison call," viewed in context of the prosecutor's entire argument, did not prejudice Appellant or deprive him of a fair trial. ***See Luster***, 71 A.3d at 1048. Thus, Appellant's third issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/14/2023</u>